# EXHIBIT 1

## THE INTERNATIONAL INSTITUTE
## FOR CONFLICT PREVENTION AND RESOLUTION

DXC TECHNOLOGY COMPANY,

Claimant,

v.

HEWLETT PACKARD ENTERPRISE
COMPANY,

Respondent.

**FINAL AWARD**

CPR NO. G-18-28-G-AA

| **Claimant Counsel** | **Respondent Counsel** |
|---|---|
| Jamie L. Wine, Esq.<br>Latham & Watkins<br>885 Third Avenue<br>New York, NY 10022<br>Jamie.wine@lw.com | Dean J. Kitchens, Esq.<br>Gibson Dunn & Crutcher LLP<br>333 South Grand Avenue<br>Los Angeles, CA 90071<br>dkitchens@gibsondunn.com |
| Douglas K. Yatter, Esq.<br>Latham & Watkins<br>885 Third Avenue<br>New York, NY 10022<br>Douglas.yatter@lw.com | Rod J. Stone, Esq.<br>Gibson Dunn & Crutcher LLP<br>333 South Grand Avenue<br>Los Angeles, CA 90071<br>rstone@gibsondunn.com |
| Adam B. Shamah, Esq.<br>Latham & Watkins<br>885 Third Avenue<br>New York, NY 10022<br>Adam.shamah@lw.com | Kirsten R. Galler, Esq.<br>Gibson Dunn & Crutcher LLP<br>333 South Grand Avenue<br>Los Angeles, CA 90071<br>kgaller@gibsondunn.com |
| Abid R. Qureshi, Esq.<br>Latham & Watkins<br>885 Third Avenue<br>New York, NY 10022<br>Abid.qureshi@lw.com | Jennifer Bracht, Esq.<br>Gibson Dunn & Crutcher LLP<br>333 South Grand Avenue<br>Los Angeles, CA 90071<br>jbracht@gibsondunn.com |

Kuan Huang, Esq.
Latham & Watkins
885 Third Avenue
New York, NY 10022
Kuan.huang@lw.com

Hilary H. Mattis, Esq.
Latham & Watkins
885 Third Avenue
New York, NY 10022
Hialry.mattis@lw.com

Jaclyn D. Newman, Esq.
Latham & Watkins
885 Third Avenue
New York, NY 10022
Jaclynnewman@lw.com

Monica K. Loseman, Esq.
Gibson Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071
mloseman@gibsondunn.com

Corey G. Singer, Esq.
Gibson Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071
csinger@gibsondunn.com

Amy R. Mayer
Gibson Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071
amayer@gibsondunn.com

Robert S. Frank, Jr.
Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
rfrank@choate.com

G. Mark Edgarton
Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
medgarton@choate.com

### FINAL AWARD

The undersigned Arbitrators (the "Panel" or "Tribunal"), having been duly appointed and qualified pursuant to the arbitration agreement contained in the Separation and Distribution Agreement dated May 24, 2016, as amended, between DXC Technology Company's predecessor, Everett SpinCo, Inc., and Hewlett Packard Enterprise Company ("SDA"), and having been duly sworn and having duly heard the allegations and proofs of the parties, do hereby AWARD, as follows:

## I.     THE PARTIES

Claimant DXC Technology Company ("Claimant" or "DXC")[1] is a Nevada corporation that provides Information Technology (hereinafter "IT") enterprise services and offers comprehensive IT solutions, including hardware and software configurations, analytics, and consulting services to business enterprises and public agencies.

Respondent Hewlett Packard Enterprise Company ("Respondent" or "HPE") is a Delaware corporation, focused on enterprise technology, such as servers, storage, and networking equipment.  HPE's captive finance company HP-FS leased IT assets to its affiliates and to third parties, while HP-ES was a subsidiary of HPE.

## II.     OVERVIEW

This dispute arises from the "spin/merge" transaction between Hewlett Packard Enterprises and Computer Services Corporation ("CSC"), which created the new entity now

---

[1] DXC emerged from the spin-off of HPE's global IT services business, ES, and the combination of that business with Computer Sciences Corporation, another IT services provider.  Under the SDA, HPE transferred ES to Everett SpinCo, Inc. ("Everett"), and then distributed the shares of Everett to HPE's shareholders.  CSC then merged with a subsidiary of Everett to form DXC.

called DXC. The negotiations for the spin/merge were complex and intense, involving the most

senior executives of both companies, and the transaction was accomplished within a short period

of time. Secrecy was key, and the negotiations used code names to refer to the parties:

"Houston" for HPE and "Everett" for the division being spun off to then merge into CSC to form

the new company, DXC. The parties' respective contractual rights and obligations are set forth

in the SDA.

DXC claims that HPE breached the SDA by failing to indemnify DXC for all long term

capitalized lease obligations that exceed $250 million, as those terms were defined in the SDA.

DXC alleges that the total amount of long term capitalized lease obligations in excess of the

$250 million cap is $1,009,131,499 when factoring in all of the Disputed Leases[2] that qualify as

capitalized leases under at least one of the applicable tests of ASC 840-10-25-1 (TX 351 at 1-2),

the accounting standard for lease classification. Generally, leases are classified as either

"capital" or "operating" under United States Generally Accepted Accounting Principles

("GAAP"). *See* ASC 840-10-05-1 (TX 1255 at 4). Capital leases reflect the transfer of

substantially all of the benefits and risks of ownership and are thus included on a lessee's balance

sheet as assets and liabilities. *See* ASC 840-10-10-1 (TX 1255 at 8). Operating leases lack the

same qualities of ownership, and so operating leases are only recognized through a periodic

expense on the lessee's income statement associated with its rental payments. *See* ASC 840-20-

---

[2] "Disputed Leases" refers to the 4,753 leases at issue in this arbitration, for which the parties
dispute classification as capital leases, and which were set to expire after March 31, 2019, and
were modified prior to March 31, 2017. These Disputed Leases would therefore be considered
"Long Term Capitalized Lease Obligations" under the SDA, if they were determined to be
capital leases. Rebuttal Expert Report of Matthew G. Bialecki ("Bialecki Reb.") (TX 1251) at 2
n.3. HPE modified more than 6,600 leases in the course of its lease conversions, but the
remainder of them expired before March 31, 2019, and were therefore not included in the "Long
Term Capitalized Lease Obligation" dispute. Expert Report of Matthew G. Bialecki ("Bialecki
Rep.") (TX 1250) at 2 n.2.

50-1 (TX 1255 at 106).

In arriving at its claimed indemnification amount, DXC contends that the SDA requires the amount of the long term capitalized lease obligations to be measured as of the defined "Distribution Date" (March 31, 2017), and not the end of the defined "Reduction Period" (September 30, 2017). DXC further claims that it is entitled to a dollar-for-dollar indemnification as of the Distribution Date from HPE for all long term capitalized lease obligations above the $250 million cap. *See* DXC Arbitration Demand, Ex. 2. (Long term capital lease obligations up to $250 million do not trigger the Indemnification obligation under the terms of the SDA.).

Respondent HPE disputes the arguments made by DXC to support its indemnification claim. HPE disputes the validity of DXC's application of each of the tests under ASC 840-10-25-1 (TX 351 at 1-2), arguing that DXC's valuation models inappropriately arrive at the number of leases that fail each of these tests. HPE also disputes DXC's interpretation of the measurement date to be applied to the indemnification provision of the SDA, and argues that long-term capitalized lease obligations over the $250 million threshold become "Excluded Liabilities" (SDA Section 2.3(b)(iii), as amended (TX 183 at 3)) only as of the end of the "Reduction Period" (September 30, 2017). *See* SDA Schedule 7.1(a) (TX 1661, Ex. 1-A). HPE rejects DXC's arguments that DXC is entitled to be indemnified for the full amount of lease obligations on the measurement date, and argues that the liabilities for the disputed leases that exceed the $250 million cap are payable only as each monthly lease payment of each lease becomes due.

HPE also contends that DXC's claims are barred by HPE's affirmative defenses of estoppel and lack of cooperation by DXC, in breach of the SDA. DXC rejects HPE's

contentions that HPE's affirmative defenses defeat DXC's claims.

## III.   PROCEDURAL BACKGROUND

The demand for arbitration in this matter is dated March 27, 2018.  The notice of defense is dated April 17, 2018.

This Tribunal has jurisdiction over this arbitration pursuant to Section 8.4 of the SDA (TX 1661), which provides that any dispute not resolved pursuant to mandatory mediation under Section 8.3, shall "be submitted to binding arbitration," to be conducted "in accordance with CPR Rules for Administered Arbitration."

Section 9.2 of the SDA (TX 1661) provides that it "shall be governed by and construed and interpreted in accordance with the Laws of the State of Delaware without giving effect to the principles of conflicts of laws thereof."

Pursuant to the Joint Stipulation of the parties, the Tribunal shall apply the Federal Rules of Civil Procedure ("FRCP"), including the Federal Rules of Evidence ("FRE"), in conducting the arbitration.  *See* Scheduling and Discovery Order # 1 ("Sched. & Disc. Order # 1") at 1-2. The initial Scheduling and Discovery Order in this matter also states: "Discovery in addition to the discovery specified in Sections 6 and 7 must be ordered by the Panel, and will be permitted upon a showing of good cause."  Sched. & Disc. Order # 1 at 3.  Section 7 of that Order provides: "Both Parties shall submit opening expert reports and rebuttal expert reports on the dates set forth in Section 2, without regard for which Party bears the burden of proof on the issue(s) addressed in such expert report."  Sched. & Disc. Order # 1 at 8.  The opening expert reports in this case were to be exchanged by the parties by November 20, 2018, and the rebuttal expert reports were due on December 12, 2018, with expert depositions concluding by January 11, 2017.  *See* Stip. Sched. & Disc. Order # 3 at 1.

### A. *Partial Summary Judgment*

On December 21, 2018, DXC moved for partial summary judgment on several issues in this case. On January 16, 2019, the Panel issued its Ruling on DXC's motion for partial summary judgment. The Tribunal granted partial summary judgment to DXC, concluding that the plain language of the indemnification provisions of the SDA requires HPE to indemnify DXC for Long Term Capitalized Lease Obligations exceeding the $250 million threshold set by Section 2.3(b)(iii) of the SDA, according to the terms of Section 6.2 " . . . from and against any and all Liabilities [as defined in Section 1.1(44)] of the Everett Indemnified Parties relating to, arising out of or resulting from any of the "Houston Indemnification Obligations," including "any Excluded Liability"; or "the failure of Houston . . . to pay, perform or otherwise promptly discharge any Excluded Liabilities, whether prior to, at or after the Distribution Time. . . ." The Ruling specifically reserved judgment as to whether the amount of indemnification owed would be dollar-for-dollar equal to the amount of the Excluded Liabilities, and on the timing of the indemnification payment obligation, informing the parties that these issues involved questions of fact as to which evidence should be presented at the hearing. Partial Summary Judgment Ruling at 6-7.

The Panel also granted partial summary judgment in favor of DXC, striking HPE's Sixth Affirmative Defense (claims barred because DXC has not suffered any recoverable loss, injury or damage), Seventh Affirmative Defense (claims barred because amounts claimed are overstated or are subject to offset), and Eighth Affirmative Defense (claims barred because the amounts claimed are subject to a contractual limitation on damages, per Section 8.7 of the SDA). The reasons for the ruling are stated in the summary judgment interim order and will not be repeated here.

### B.  *Ruling on Cannici as Witness*

On January 26, 2019, the Panel ruled on DXC's objection to HPE calling Jaclyn Cannici

of the accounting firm Duff & Phelps as a fact witness.  DXC objected on the ground that Ms.

Cannici was not noticed in accordance with the Scheduling and Discovery Order, and was not a

"fact or expert witness" that HPE identified "30 days prior to the fact discovery cutoff," or a

Duff & Phelps employee from whom a deposition was taken. *See* Order Ruling on Objection to

Designation of Jaclyn Cannici on Final Witness List ("Cannici Ruling") at 2.

HPE argued that it timely disclosed its intention to call "Duff & Phelps," without naming

Ms. Cannici, and that both sides disclosed the various third-party accounting and consulting

firms in the same manner. *See* Cannici Ruling at 2.

The Panel ruled that Ms. Cannici would be permitted to testify, and that she was to be

deposed before the hearing.  Cannici Ruling at 3.  Because she was never identified as an expert

witness, the Panel instructed that she could testify only as a fact witness; cautioning that her

testimony could not include matters based on her "technical, or other specialized knowledge,"

because such testimony is limited by FRE 701(c) to expert witnesses. Cannici Ruling at 3.[3]

### C.  *The Arbitration Hearing*

The hearing in this matter was conducted in New York, NY on February 4-16, 2019,

during extended days in order to permit counsel to introduce all evidence and testimony that they

---

[3] During the briefing on DXC's objection to Ms. Cannici as a witness, HPE never disclosed to DXC or to the Panel that Ms. Cannici had been retained by HPE's counsel, Gibson Dunn, as a paid consultant on the case since December 2017. Hearing Transcript ("Hrg. Tr.") at 3143:8-19 (Cannici).  This fact came to light during the hearing in this matter and the Panel struck her testimony as a result of counsels' failure to make this crucial disclosure, which should have been disclosed in HPE's submissions when the motion to exclude Ms. Cannici was briefed and argued prior to the hearing. Hrg. Tr. at 3143:8-3153:10 (Cannici). Because Ms. Cannici had already begun to testify, the Panel permitted DXC to cross-examine her.

wished to present. Claimant was represented throughout the proceedings by Jamie L. Wine, Douglas K. Yatter, Abid R. Qureshi, Kuan Huang, Hilary H. Mattis, and Adam B. Shamah of Latham & Watkins LLP. Respondent was represented throughout the proceedings by Dean J. Kitchens, Rod J. Stone, Kirsten R. Galler, Jennifer K. Bracht, Monica K. Loseman, Amy R. Mayer, and Corey G. Singer of Gibson Dunn & Crutcher LLP, as well as Robert S. Frank, Jr. and G. Mark Edgarton of Choate Hall & Stewart LLP.[4]

Extensive pre-hearing briefing was submitted by the parties, and an exceptionally large number of exhibits was introduced and admitted in the course of the hearing. Certain witnesses were on both parties' witness lists; rather than call them twice, they were questioned using the adverse witness rules of the Federal Rules of Civil Procedure.

During the hearing, the following witnesses testified as fact witnesses:

- Paul Saleh, Chief Financial Officer ("CFO") for DXC; formerly CFO for CSC

- Charles Diao, Corporate Treasurer for DXC, Senior Vice President of Finance

- Peter Evans, former Assistant Corporate Controller for DXC

- Herve Maciejewski, Assistant Corporate Controller, Chief Accounting Officer for DXC

- Christopher Natali, Assistant Corporate Controller for HPE

- Carita O'Leary, Global Business Development Manager for HPE-FS

- Ian Fowlis, Chief Financial Officer for HPE-FS

- Colleen Davis, Vice President of Finance for DXC

- Neil Manna, Corporate Controller and Principal Accounting Officer for DXC

- Brian Diggins, Global Leasing Consultant for DXC

---

[4] The Panel wishes to commend all counsel from both sides for doing an admirable job cutting through the dense and complex issues of this case, and for fiercely and effectively advocating for their respective clients.

- Michael Titta, Audit Partner for Deloitte & Touche

- Jaclyn Cannici, Director of Machinery and Valuation at Duff & Phelps

- Chris Hsu, former Chief Operating Officer of HPE

- John Cassidy, Partner at Ernst & Young

Both parties presented extensive expert testimony.  At the outset of the hearing, the expert reports were admitted into evidence.  Claimant presented the following expert witnesses:

- Matthew Bialecki

- D. Gregg Dight

- Louis Dudney (expert report submitted pre-hearing; did not testify, per agreement of the parties)[5]

- Arnold I. Barnett (expert report submitted pre-hearing; did not testify, per agreement of the parties)

Respondent presented the following expert witnesses:

- Patrick Furey

- Charles Lundelius (expert report submitted pre-hearing; testified orally only about matters other than enterprise value, per agreement of the parties)

- Jeffrey Ellis

---

[5] During the hearing, the parties withdrew their rights to present oral testimony of Mr. Dudney and Mr. Lundelius on the issue of enterprise value.  Mr. Lundelius did testify orally about other matters.  The subject matter of Mr. Dudney's report and the enterprise value portion of Mr. Lundelius' report dealt with whether or not, in their respective expert opinions, the capital lease debts impacted the enterprise value of the transaction, but the parties decided mid-hearing not to present expert evidence on that issue.  (Hrg. Tr. at 3726:12-3728:19, 3747:24-3755:25).  Neither party made arguments in their post-hearing submissions in reliance upon expert evidence relating to enterprise value. (Hrg. Tr. at 3724:25-3725:14, 3725:24-3726:10).  The Tribunal does not rely on either expert's report on enterprise value in making its decision about the issues in this case, and noted only the fact witnesses' email exchanges between the principals during their negotiations on that issue.

Both sides also introduced excerpts of deposition testimony into evidence in the course of the hearing. Deposition testimony was presented as the testimony of:

- Thomas Martin, Partner in Capital Markets and Accounting Advisory at PricewaterhouseCoopers, consultant for DXC (Joint Deposition Transcript Excerpts admitted as TX 1658)

- Joseph Dierdorf, Consultant on accounting issues for HPE (Joint Deposition Transcript Excerpts admitted as TX 1659)

- Gerald Musser, Worldwide Corporate Controller for HPE-FS (Joint Deposition Transcript Excerpts admitted as TX 1660)

### D. Post-Hearing Correspondence

On February 26, 2019, after the hearing in the matter had concluded, the Panel sent to the parties a document titled "Post-Hearing Instructions and Information Requests from the Panel" ("Panel Requests"). These Panel Requests asked the parties to provide follow-up information responsive to outstanding questions that the Panel had after the conclusion of the hearing, and to run certain additional calculations to assist the Panel in its analysis of the issues.

One of the items the Panel sought in its Panel Requests was a calculation that applied DXC's expert, Mr. Dight's, depreciation curves to a different figure than had been done in his expert report[6] for a subset of the asset models at issue in the Disputed Leases. Both counsel sought clarification, which the Panel answered in clear terms. On March 18, 2019, HPE's counsel submitted to the Panel an unsolicited letter suggesting that this calculation be performed for all assets at issue in the case. On March 21, 2019, the Panel issued a response letter, stating

---

[6] This issue will be discussed in more detail below. As the Panel notes below, these additional calculations were not relied on by the Panel in its decision.

that it "did not seek nor authorize" the submission by HPE, and that it was "not seeking further analysis for the other sets of assets." The parties then provided their respective responses to the Panel Requests on April 5, 2019.

### E. Post-Hearing Briefing; Motion to Strike Unauthorized Expert Conclusions by HPE

Extensive post-hearing briefing was submitted by both parties. On April 22, 2019, DXC filed a motion requesting that the Panel strike certain submissions made by HPE in the course of its post-hearing briefing. DXC's motion to strike argued that these HPE submissions constituted improper and untimely expert analysis of certain issues in the matter, including an attempt to re-submit the "Replacement Cost New" analysis that the Tribunal had earlier clearly and explicitly stated that it did *not* seek nor authorize when HPE's attorneys had asked to provide such analysis in response to the Panel Requests.[7]

### F. Motion to Strike Portions of HPE's Post-Hearing Briefs

Both parties submitted briefs on DXC's Motion to Strike. The Motion to Strike was granted in part and the Tribunal struck the following HPE submissions: (1) Appendix 1 to HPE's Post-Hearing Brief (3 tables of analysis performed by HPE's expert, Mr. Furey); (2) Paragraphs 7-9 of Appendix D to HPE's Post-Hearing Reply Brief (3 paragraphs of a declaration by HPE's expert, Mr. Ellis, addressing hearing exhibits TX 1615, TX 1616 and TX 1617); (3) Appendix B to HPE's Post-Hearing Reply Brief (Mr. Furey's Replacement Cost New calculations). The

---

[7] As discussed in more detail below, DXC moved to strike certain portions of HPE's post-hearing briefing on the basis that it introduced new expert opinion that had never been included in an expert report. Much of this related to the additional calculations that the Panel had explicitly not sought. Following briefing, the Panel granted DXC's motion in part and ordered HPE to submit redacted versions of its post-hearing briefs, excluding the stricken material. In its redacted post-hearing briefing, HPE replaced the stricken expert analysis with a citation to exhibits constituting the raw data for the stricken material, which are spreadsheets of tiny-print raw data that filled an entire carton.

Panel did not strike paragraph 3 of Appendix D to HPE's Post Hearing Reply Brief (Mr. Ellis'

comments on DXC expert's, Mr. Bialecki's, assumptions in calculating various "scenarios" for

indemnification), with the caveat that "[t]o the extent that Mr. Ellis is saying that [Mr.

Bialecki's] approach is an incorrect approach to use for the 75% test, his opinion is barred as

untimely." May 6, 2019 Panel Ruling at 6.

    In its opinion on the Motion to Strike, the Tribunal found that the information set out in

Appendix 1 was barred by the Federal Rules of Civil Procedure ("FRCP") because it was

"untimely, has not been sought by the Panel and constitutes a detailed analysis by Mr. Furey, that

goes far beyond his pre-hearing expert report or rebuttal report in this case." May 6, 2019 Panel

Ruling at 5.  The Panel found that Appendix B "is a new expert report of Mr. Furey, and is

stricken under the Federal Rules of Civil Procedure and the Panel's rulings." *Id.* at 8.  Thus, the

Panel again clearly and forcefully stated that the FRCP bars consideration of expert analysis that

had never been presented in expert reports:  HPE had produced 8 expert reports by Mr. Ellis, Mr.

Furey, and Mr. Lundelius, including two supplemental expert reports by Mr. Ellis after the

deadline for submission had passed; DXC produced 6 expert reports by Mr. Bialecki, Mr. Dight,

Mr. Barnett and Mr. Dudney.  The Panel also allowed portions of Mr. Ellis' further Declaration,

Appendix D, to stand to the extent it compared data as he had been requested to do, but reserved

for the Panel the issue of the authenticity of these purported underlying documents to TX 1615,

TX 1616, and TX 1617, which is in the Panel's authority to determine based on the evidence.

May 6, 2019 Panel Ruling at 6-7.

### G. *Final Oral Argument in Summation*

    Following the submission of post-hearing briefs, the post-hearing oral argument was held

on May 10, 2019, with summations presented by the parties, supported by references to the

transcript of testimony and documentary evidence in the hearing record.

## IV.     FACTUAL BACKGROUND

### A.  *The Transaction: The Spin-off and Merger of HPE's Enterprise Services Segment*

In early 2016, technology services companies Computer Services Corporation ("CSC")
and HPE began discussing a potential combination of CSC with HPE's Enterprise Services
segment ("ES") through a spin-off/merger transaction that would result in the creation of a new
corporate entity (the "Transaction"). During the negotiations, the Enterprise Services subsidiary
of HPE was dubbed "Everett"; it was spun off and merged with CSC, and became DXC. In the
Transaction documents, which culminated in the Separation and Distribution Agreement
("SDA") contract, the reference to Everett in reality means DXC; and in those same documents,
the reference to "Houston" in reality means HPE.

The Transaction negotiations were led by Paul Saleh, the Chief Financial Officer of
CSC, and Chris Hsu, HPE's Chief Operating Officer. In April 2016, Saleh, Hsu and others
worked to memorialize the key terms of the proposed Transaction in a term sheet (TX 32),
which, among other details, set out that the combination of CSC and Everett/ES would occur
immediately following the completion of the spin-off of that subsidiary from HPE.

The term sheet also memorialized the parties' agreement that the Transaction would be
structured as a reverse Morris Trust, a structure that created tax benefits for both parties. (TX 32
at 1). In order to qualify for the reverse Morris Trust classification, the parties agreed that the
shareholders of both parties had to retain a majority of DXC's stock, which was possible because
there was overlapping ownership, resulting in a division of approximately 50%/50% of equity.
(TX 32 at 1). It was agreed that Everett/ES's enterprise value – the price CSC would pay for that
business – was $8.5 billion, which entitled HPE to $8.5 billion in consideration. Pursuant to the

term sheet, HPE would receive approximately 50% of the combined company's equity ($4.574 billion). (TX 32 at 1). In addition, the term sheet laid out that the following specifically identified debt would transfer from HPE to the combined company: (1) $570 million in Everett/ES net pension liabilities; (2) $300 million in existing Everett/ES notes; (3) $ 1.5 billion in new debt to fund a cash payment to HPE; and (4) $1.555 billion in a debt-for-debt exchange. (TX 32 at 1). The term sheet contained no reference to any assumption by CSC/DXC of any HPE debt in the form of capitalized lease liabilities, which all parties agree are booked as debts or debt-like instruments on the balance sheet.

### B. Discovery of the Existence of the HPE Debt: The Capital Lease Liabilities

Shortly before the planned May 24, 2016 execution of the SDA, which would culminate the Transaction, CSC's due diligence consultant, Deloitte & Touche ("Deloitte"), alerted CSC to its discovery of the existence of $1.3 billion of capital lease liabilities on HPE-ES's balance sheet. (TX 68). These leases were intercompany leases from HPE-FS (Hewlett Packard Financial Services subsidiary of HPE, "HPE-FS"), as lessor, to HPE-ES, as lessee, and accordingly did not appear on the face of the financials because they were netted out in the company's consolidated statements. These inter-company leases were between the two different HP subsidiaries for information technology assets such as mainframes, laptops, desktops, and servers that HPE-ES used to provide certain of its Enterprise Services to its customers. Bialecki Rep. (TX 1250) at 4-5. Once the ES subsidiary was spun off, it would carry that debt with it, so that it was no longer just an inter-company transaction.

CSC's top executives were very concerned about the impact of receiving additional debt on the balance sheet in the form of these capital leases, and expressed that concern in an urgent

and serious way to HPE.[8]  Saleh's concern was pressing, real, and urgent, going so far as to say, in sum and substance, that the deal could not be transacted without a provision to make sure that the newly merged entity, DXC, would not carry more debt than the financial term sheet had stated for the enterprise valuation.  *See* TX 1053 at 2 (May 18, 2016 Saleh email to Hsu explaining that "this appears to be a real issue" that affects both "valuation and debt ratings. Will need to address and resolve."); Hrg. Tr. at 170:12-19 (Saleh).

This discovery of $1.3 billion in undisclosed debt on the books of HPE-ES sparked an urgent email exchange between the top executives of the two companies.  On May 17, 2016, Saleh asked Hsu for more information about them.  (TX 1053 at 2).  Learning of Saleh's concern, Hsu asked Ian Fowlis, HPE-FS's Chief Financial Officer, for data to assist Hsu in understanding the types and amounts of capital leases that existed between ES and FS.  (TX 1325 at 1-2).  Fowlis was the top financial executive who knew about the existence of these capital leases.  Fowlis is the CFO of the Financial Services subsidiary of Hewlett Packard, HPE-FS which would remain with HPE after the spin-off of the Enterprise Services subsidiary, HPE-ES.

Upon hearing from Hsu about CSC's serious concerns about this debt issue, Fowlis returned from a trip to India to "be of better service" in getting Hsu information about these capital lease obligations. (TX 1325 at 1).  And Fowlis informed his HPE colleagues that the majority of the $1.3 billion leases were, in fact, capital leases.  (TX 124).

The existence of these capital leases put the entire Transaction in jeopardy.  On May 20,

---

[8] In its opening statement (Hrg. Tr. at 79:22-80:11), HPE stated that this debt only mattered for the presentation to the bond rating agencies, as Hsu had said at the time. While that was Hsu's view, Saleh emphatically stated in multiple emails in evidence, that an equally important concern as stated by DXC was about the valuation of the deal if it was asked to take on an additional $1.3 billion dollars of debt-like instruments. (TX 1053 at 1 and 2).

16

2016, shortly before the planned execution date, HPE's Controller, Ricci, emailed Fowlis, saying that this issue was "the largest gating item to getting the deal done in its current form." (TX 52 at 1).

To keep the deal from collapsing, HPE proposed a solution: HPE would undertake to modify its capital lease terms, so that they could qualify under GAAP as operating leases, because that type of lease is not reported as debt on the balance sheet. However, there are strict accounting rules that must be met to convert a capital lease to an operating lease. CSC agreed to do the Transaction, in reliance on HPE's commitment to successfully convert the approximately $1.3 billion of capital leases to operating leases. In order to give some comfort to HPE in case some of the leases could not be successfully converted to operating leases, CSC agreed that it would assume up to a "cap" of $250 million of capital lease obligations that would transfer to the spin-merged entity upon completion of the Transaction.

The amount of the "cap" was the subject of serious negotiations between the parties before it culminated in the $250 million figure. HPE had first proposed a $500 million cap, which CSC rejected, and then a $350 million cap, which CSC also rejected. (TX 41). CSC ultimately agreed to a $250 million cap on capital leases that it would assume without financial repercussion to HPE. (*Id.*). This cap on capital lease liabilities that would transfer to DXC was incorporated into the SDA that would be signed by the parties.

### C. *The Separation and Distribution Agreement ("SDA")*

On May 24, 2016, the parties executed the Separation and Distribution Agreement ("SDA") for the Transaction. (TX 1661). The SDA defines and identifies the assets and liabilities that would be transferred to Everett as part of the spin-off ("Everett Liabilities"), and those liabilities that would remain with HPE ("Excluded Liabilities"). Specifically, Section 2.3

of the SDA sets out those capital leases that would become "Everett Liabilities" that would spin

off with ES:

> [T]he Liabilities arising out of or resulting from (A) the Total Everett Debt, (B) the Inherited Debt and (C) up to $250,000,000 in the aggregate among all Everett Group members of capitalized lease obligations as of the Distribution Date.

SDA (TX 1661) Section 2.3(a)(vi).  This Section also identifies those "Excluded

Liabilities" that would remain with HPE:

> Liabilities, if any, arising out of or resulting from any amounts that would constitute indebtedness or capitalized lease obligations of any member of the Everett Group under U.S. generally accepted accounting principles other than: (A) the Total Everett Debt; (B) the Inherited Debt; and (C) up to $250,000,000 in the aggregate among all Everett Group members of capitalized lease obligations as of the Distribution Date.

SDA (TX 1661) Section 2.3(b)(iii).

These provisions of the SDA were amended in November 2016 to distinguish

between long term and short term capitalized lease obligations, so that only long term

capital lease obligations would require Indemnification from HPE to DXC if they

exceeded the cap:

> [T]he Liabilities arising out of or resulting from (A) the Total Everett Debt, (B) the Inherited Debt, (C) all Liabilities specified in subclauses (ii), (iii), (v) or (vi) of this Section 2.3(a) that are (I) capitalized lease obligations that expire on or before March 31, 2019 ("Short Term Capitalized Lease Obligations"), and (II) capitalized lease obligations that expire after March 31, 2019 ("Long Term Capitalized Lease Obligations") in an amount up to $250,000,000 in the aggregate among all Everett Group members as of the Distribution Date and (D) the Specified Everett Liabilities set forth in Schedule 2.3(a)(iv).

SDA Section 2.3(a)(iv), as amended (TX 183 at 3).

> Liabilities, if any, arising out of or resulting from any amounts that would constitute indebtedness or capitalized lease obligations of any member of Everett Group under U.S. generally accepted accounting principles other than: (A) the Total Everett Debt; (B) the Inherited Debt; (C) all Short Term

> Capitalized Lease Obligations; (D) Long Term Capitalized Lease Obligations in an amount up to $250,000,000 in the aggregate among all Everett Group members as of the Distribution Date; and (E) for the avoidance of doubt, the Specified Everett Liabilities.

SDA Section 2.3(b)(iii), as amended (TX 183 at 3).

Section 2.1 provides that to the extent "Excluded Liabilities" exist, "[HPE] shall accept and assume from Everett . . . and agree to faithfully perform, discharge and fulfill the Excluded Liabilities . . . and shall be responsible for all Excluded Liabilities, regardless of when or where such Excluded Liabilities arose or arise." SDA (TX 1661) Section 2.1(a)(iv).

HPE also promised to indemnify DXC if it failed to live up to its undertaking to properly convert all but $250 million of long term capital leases to operating leases. Section 6.2 of the SDA is the indemnification provision:

> [HPE] shall indemnify, defend and hold harmless [Everett] . . . from and against any and all Liabilities of [Everett] relating to, arising out of or resulting from . . . any Excluded Liability . . . [or] . . . the failure of [HPE] . . . to pay, perform or otherwise promptly discharge any Excluded Liabilities, whether prior to, at or after the Distribution Time.

SDA (1661) Section 6.2(a)-(b).

An additional amendment to the SDA created a 6-month period defined as the "Reduction Period," set forth in SDA Schedule 7.1(a), which provides:

> For a period ending six (6) months after the Distribution Date (the "Reduction Period"), Houston and Everett shall use commercially reasonable efforts to reduce the aggregate amount among all Everett Group members of Long Term Capitalized Lease Obligations in excess of $250,000,000. It is further agreed that, notwithstanding Sections 2.3(a)(iv) and 2.3(b)(iii) and anything else to the contrary in this Agreement, any such amounts in Long Term Capitalized Lease Obligations that exceed $250,000,000 in the aggregate shall be considered Excluded Liabilities only after the expiration of the Reduction Period (and, for the avoidance of doubt, prior to the expiration of the Reduction Period shall be considered Everett Liabilities).

SDA (TX 1661, Ex. 1-A).

19

### D. *Lease Conversion Discussions and the October 2016 White Paper*

Following the execution of the SDA, HPE needed to make good on its promise to convert the capital leases into operating leases, or face a serious financial indemnity obligation if any long term capital leases exceeded the $250 million "cap." HPE designated the lead responsibility for its duty to properly modify its capital leases to Ian Fowlis, Chief Financial Officer of HPE-FS, the HPE subsidiary that was the lessor of those leases. HPE knew that ES held over 10,000 such capital leases, and that the debt they represented was over $1.3 billion. (TX 1024). Ian Fowlis was assisted by Carita O'Leary, who was an HPE-FS Business Development Manager. Hrg. Tr. at 1063:10-15, 1065:2-23, 1085:7-11 (O'Leary); 1306:11-13 (Fowlis). Neither had ever attempted to do a large-scale lease conversion before, but HPE chose to keep the project under its own internal control. Hrg. Tr. 1065:24-1066:12 (O'Leary); 1309:6-9 (Fowlis).

In September 2016, CSC started making inquiries about the details of HPE's lease conversions. (TX 15; TX 221; TX 1110). CSC sought this information for the purpose of preparing a Form S-4 Registration Statement for the Transaction, which would include pro forma financial statements for the combined entity. Form S-4 pro forma financial statements are not audited and require only "financially supportable" assumptions. (Following a merger, the new entity has a year after the merger has occurred to file with the SEC its true audited financial statements.). The S-4 Registration Statement is an unaudited future-looking "pro forma" set of financials that is filed before the closing of the Transaction.

At the time of the S-4, and indeed, during the entire time up to the March 2017 closing, only HPE knew what it was actually doing to convert the capital leases. As will be described below, what HPE represented to CSC that it would do, and what HPE actually did in the lease

conversion process, are two very different things.

In response to CSC's questions about the status and methodology of the lease conversion process being used by HPE to honor its contractual commitment to convert these $1.3 billion of HPE-ES capital leases to operating leases, HPE wrote and gave to CSC a White Paper document dated October 17, 2016 (the "October 2016 White Paper") (TX 79). Fowlis had lead authorship responsibility for the October 2016 White Paper. Hrg. Tr. at 1486:15-1487:10 (Fowlis).

A "White Paper" is a term of art used in the accounting profession to describe accounting methodology to be used in a transaction. The HPE October 2016 White Paper set forth information and representations by HPE about its lease conversion methodology. (TX 79). The stated purpose of the October 2016 White Paper was "to provide CSC with perspectives on the post-acquisition accounting for leases being converted from capital leases to operating leases." (TX 79 at 2). At the time the October 2016 White Paper was given to CSC, HPE was working on, but had not yet completed, its final lease modifications. Hrg. Tr. at 1330:16-1331:3 (Fowlis). While the HPE team was writing the White Paper to be given to CSC, Fowlis admitted to Colleen Davis in an internal email "that regardless of what the [White] paper says, these are truly Capital Leases." (TX 124).

The October 2016 White Paper acknowledged that "[a]t the time of the deal, ES and HPE-FS had a number of inter-company arrangements that would be assessed as capital leases under US GAAP." (TX 79 at 2). It stated that "CSC and HPE agreed that a program would be undertaken to restructure these arrangements, such that 6 months after closing of the transaction (currently projected to be September 30, 2017), HPE would have transferred to CSC a maximum capital lease obligation of $250 million," and that the "criteria under Accounting Standard Codification (ASC) 840 – Leases will be assessed to ensure achievement of operating lease

treatment." (TX 79 at 2).

HPE told CSC in the October 2016 White Paper, that it believed "that these lease modifications do not meet any of the four lease classification criteria contained in ASC 840-10-25-1," and that "[t]herefore, they should be classified and accounted for as operating leases." (TX 79 at 2).  The October 2016 White Paper also stated that HPE had "reviewed the following analysis with [its] auditor, Ernst and Young, who support[ed] [its] conclusion." (TX 79 at 2). When that auditor testified at the hearing, he was not happy to see that statement because it was added after his review of the document and EY had not yet conducted its audit procedures. Hrg. Tr. at 4173:13-4174:5 (Cassidy).

The October 2016 White Paper set out the following representations about key inputs that were essential parts of the GAAP tests for classifying leases as operating versus capital leases. These are essential features of the GAAP lease classification criteria[9] to be performed in evaluating the Disputed Leases:

- Fair Value: (to be used as the denominator in the "90% Test") – HPE stated that "[t]he fair value used for the 90% test at the modified lease inception was determined using the net investment value [*i.e.,* "net book value"] of the underlying assets." (TX 79 at 6).

- HPE further represented that it would use net book value *only* for leased assets under leases older than two years.  (TX 79 at 6).

- For leases less than two years old, HPE represented that it would perform a "case-

---

[9] The "lease classification criteria" are those set out in ASC 840-10-25-1 (TX 351 at 1-2), and consist of four tests that must be passed in order to avoid classification as a capital lease.  These key criteria are discussed in more detail below, but include, *inter alia,* the "75% Test" and the "90% Test" for lease classification.  All four tests must be passed, or the lease is classified as a capital lease.

by-case analysis" of each lease less than two years old to determine the fair value
of the assets under those leases.  (TX 79 at 6).

- Discount Rate: (to be used as the numerator in the "90% Test") – HPE stated: "We
  used a range of discount rates that varied based on country and is reflective of the
  term of the underlying leases.  We also believe this rate is materially consistent with
  the interest cost ES would have incurred on debt obtained over similar term for the
  specific purpose of acquiring the leased asset." (TX 79 at 7).

- Estimated Economic Life: (to be used as the denominator in the "75% Test") – HPE
  set out a chart of purported estimated economic lives of the leased assets. (TX 79
  at 6).

The hearing testimony and documentary evidence revealed that several key
representations made by HPE were not in fact what HPE actually did in carrying out the lease
conversions.  The evidence on each important issue will be set forth in the sections dealing with
the tests mandated by ASC 840-10-25-1 (TX 351 at 1-2), in order for a lease conversion to meet
the requirements of GAAP.

After receiving the October 2016 White Paper, CSC sent HPE follow-up questions
seeking support and clarification of some of HPE's assertions.  (TX 80).  With regard to fair
value, CSC questioned the use of net book value and asked for "support that FMV actually
decreases linearly aligned with depreciation of the life of the asset." (TX 80 at 2).  This concern
expressed by CSC questioned the propriety of two methods that HPE wanted to use in its lease
conversions:  (1) using "book value," which is the adjusted cost that is often carried on the books
of a company, rather than a "fair value" appraisal of the asset under lease; and (2) the use of
straight line depreciation for tech assets such as those under lease, when such assets are usually

23

depreciated on a curve that represents accelerated depreciation of assets that lose value more rapidly in the early years of their life.

Internally, Fowlis acknowledged that, intuitively, accelerated depreciation seemed like the logical approach, much like when you buy a car (*See* TX 78 at 1), even though the White Paper said otherwise. Answering CSC's questioning of HPE's use of "net book value" rather than appraised "fair value" of the assets under lease, HPE responded that it had a "proprietary model" based on resale data compiled by HPE that supported the claim that net book value was a good proxy for fair value, but that it would not share such "proprietary" data with CSC. *See* TX 81; Hrg. Tr. at 1363:16-1364:16 (Fowlis). Even when CSC asked to see this data in a "clean room" process, where there could be no knowledge of the data conveyed to those on the business side of CSC operations, HPE refused to produce the "proprietary model," which HPE felt was competitively sensitive. This purported "proprietary model" was never produced as evidence in the case, despite the strong terms of the confidentiality order in the case that would have protected it.

### E. DXC's Continued Inquiries Regarding Lease Conversion After the Transaction Closing in March 2017, and the July 2017 White Paper Response by HPE.

HPE was in sole control of the lease modification process until the Transaction closed on March 31, 2017. On April 1, 2017, with HPE-ES spun off and distributed into Everett SpinCo, Inc., ES then merged with CSC to form DXC. HPE told DXC that it had completed its lease modifications in February 2017. Hrg. Tr. at 1276:4-19 (O'Leary). (DXC was not aware of the actual methods used by HPE to convert the leases until late in 2018, during discovery in this arbitration.).

After the closing, DXC began the process of doing its required "purchase price accounting" for the assets and liabilities it acquired from HPE. DXC assigned this project to its

accounting advisors at the consulting firm PwC. DXC's accounting advisors at PwC began by using HPE's assumptions to undertake this task, but they soon identified several key HPE assumptions that, in PwC's opinion, raised questions that required further review: These included, *inter alia,* HPE's discount rates and fair values – central ingredients to the GAAP tests mandated by ASC 840. (TX 1411).

Following PwC's analysis, DXC asked HPE to answer these questions, so that it could find support for the accounting treatment that HPE had used to convert the leases. On June 29, 2017, Colleen Davis, DXC's Vice President of Finance, sought information from Fowlis. Davis had previously worked at HPE in the ES division that had been spun off and merged into DXC, and she knew Fowlis. She told Ian Fowlis that DXC's accounting team "had an issue come up with the evaluation of the lease conversion process related to the assumption that NBV [net book value]/FMV [fair market value] are equal." (TX 129). By this date, DXC's accountants were working on the purchase price accounting process that DXC was required to undertake within the 12 months following the merger, and Davis alerted Fowlis that DXC had concerns about whether HPE's assumption that "net book value" was the equivalent of "fair market value" could be supported. DXC again asked that HPE share the illustrative retail pricing curves that HPE had said would support its use of net book value as a proxy for fair value. (TX 1013).

Davis also requested detail on what discount rates HPE had used in the ASC 840 test, and asked if those rates were *the lower of* the implicit rate or the incremental borrowing rate, which is an important part of the GAAP test. (TX 287).

In response to DXC's inquiries, HPE sent DXC a curve purportedly reflecting a wholesale pricing curve to support HPE's assertion that net book value was a good proxy for fair value. (TX 1015). However, that pricing curve did not principally reflect prices of the assets;

rather, it more often reflected the prices paid by lessees to "buy out" leases early. DXC was genuinely concerned that this method, which was based on the lease payment stream rather than the assets' value, was not permitted by GAAP accounting as a way to measure the "fair value" of assets.

At this time, DXC's accounting consultants at PwC also modeled an analysis of sample leases. The result of those sample tests was that the leases failed the 90% test, which is one of the tests required by GAAP, if fair value was based on wholesale prices. (TX 166-Martin at 9, 16-19). Accordingly, Ms. Davis again sought asset level details from HPE to see if it could find support for the accounting assumptions and process used by Fowlis' team at HPE in doing the lease conversions.[10]  But, upon receiving this request and concluding that "DXC is challenging the lease conversion," Ian Fowlis instructed Carita O'Leary on July 14, 2017, "not [to] send anything additional to [DXC] until we talk." (TX 108).  Fowlis continued to instruct O'Leary to ignore DXC's requests for additional information. (TX 109; TX 1016).  Thus, 3-4 months after the closing of the merger, while DXC was conducting its mandatory purchase price accounting process, DXC was encountering an information stonewall from HPE. The purchase price accounting needed to be fully complete, with accurate financial accounting reported to the SEC within 12 months of the merger, and DXC had to complete its quarterly financial reporting. Time mattered.

DXC's need for the important information sought became an issue that was addressed at higher management levels at DXC. DXC's Controller, Neil Manna, contacted his counterpart at

---

[10] Ms. Davis acknowledged that DXC already had this asset level detail data in its possession, but she did not learn that until December of 2017. Hrg Tr. 1696:5-1698:16. If HPE really wanted to assist DXC in supporting the conversion, a more open and forthcoming approach to this exchange would be expected.

HPE, Chris Natali, HPE's Assistant Corporate Controller, in an attempt to get the accounting information needed by DXC to support the accounting formula inputs that HPE had used in its lease conversion process. On July 13, 2017, DXC's Controller told HPE's Assistant Controller that DXC was "having difficulty getting the accounting support finalized" on the leases and needed additional information regarding HPE's use of net book value. (TX 86).

This information demand by DXC elicited another "White Paper," rather than the information that had been sought. On July 15, 2017, HPE sent DXC a new document addressing whether "net book value" was a reasonable proxy for "fair value" (the "July 2017 White Paper"). (TX 119). This White Paper did not contain the asset sales data that DXC had requested, and while it included broker assessments of value, it relied heavily on lease buyouts and lease sales, which again raised red flags about whether HPE had used lease payments as its basis for the "fair value" component of the GAAP test in ASC 840, which is not permitted by GAAP. *See* Hrg. Tr. at 3675:9-13 (Furey) (HPE expert agreeing that "using lease payments to value assets would be inappropriate under ASC 840.").

Not surprisingly, the July 2017 White Paper yielded more questions than answers. On July 16 and 17, 2017, DXC's Manna sent his counterpart at HPE requests for further information that could support the manner in which HPE did the lease conversions. (TX 88). These requests were essential; following the merger, DXC had the duty to report proper GAAP accounting in its company financials. Thus, DXC needed to be able to demonstrate accurate and supportable purchase price accounting treatment of the merger Transaction and independently assess the classification of the leases. DXC's Controller told his HPE counterpart, Natali, as well as HPE-FS's CFO, Fowlis, that, despite the July 2017 White Paper, DXC was "struggling [to] maintain[] operating lease treatment." (TX 88). HPE did not respond to these inquiries or concerns.

Instead, HPE executives communicated internally about how to deal with DXC's requests for data to support the lease conversion method that had been used by Fowlis to convert the leases.

In an internal HPE email written the next day, July 18, 2017, Ian Fowlis told senior HPE executive – HPE's Chief Financial Officer – Tim Stonesifer:

> DXC is having trouble with one point regarding the lease conversion. HPE took the position that our Net Book Value was a proxy for fair value at the time of the conversion. DXC is going down a path that seems to be looking more at Liquidation Value should have been used which is obviously significantly lower than Net Book Value and could lead them to conclude the leases are still Capital Leases for their Q1 close. They have been sending HPE numerous data requests over the last several weeks including another 8 in the last 48 hours after we provided them a whitepaper last Friday evening.
>
> I just got off the phone with Chris Natali, EY and PWC. We believe it is no longer a good use of time trying to field all of DXC queries and we would like to propose getting a 3rd party appraisal for the $1.2B of assets subject to the lease conversion. The problem is this will not be done in time for DXC quarter end so the ask is to potentially get an appraisal done for a sample before the end of next week which I don't know how likely this is until we speak to the appraiser later today. EY felt between the whitepaper and the sample they would have enough for Deloitte for Q1 review with the understanding for [sic] they may still need their own appraisal for valuation. We have historically used Duff & Phelps so Chis Natali is reaching out to the relationship partner and I am reaching out to the managing director we have used previously. Based upon these discussion [sic] Chris was going to reach back out to Neil Manna with our proposed path forward. None of this has been communicated to DXC as of now.

(TX 307).

### F. Duff & Phelps Asset Sample Appraisal

Acting on this email, Fowlis engaged the valuation firm, Duff & Phelps ("Duff"), to appraise a sample of the leased assets. His purpose was to get a sample of asset appraisals that would respond to DXC's repeated requests for asset fair value data and justification. By now, it was close to the date by which DXC would need to file its quarterly financial statements, and Fowlis was worried that DXC might report that the leases failed the operating lease tests in ASC

840, and thus were still capital leases. An internal Duff & Phelps email on July 19, 2017 stated: "HPE would like to confirm the Fair Value of the assets within the leases ...; if FV<NBV that will trigger a payment due to DXC in the amount of the difference (NBV-FV)." (TX 805). After being contacted by Mr. Fowlis, the Duff & Phelps appraiser also acknowledged: "There are real dollar implications to our work for HP." (TX 806).

Fowlis quickly hired the Duff & Phelps appraiser, who, within 10 days, produced a report on how these sample assets had fared under the pertinent accounting test. Fowlis shared those results internally at HPE on July 31, 2017. (TX 137; TX 138). In doing the appraisal of the fair value of the asset sample provided by HPE, Duff & Phelps' managing director used a "market valuation" approach, with an "accelerated depreciation curve" for the 90% Test set forth in ASC 840. The report concluded that the "fair value" of these assets in the sample was lower than "net book value" for 17 out of 25 sample leases. This would mean that the valuation method used by HPE as an input in the 90% Test was not supportable in two-thirds of the leases.

This was not the answer that Fowlis wanted. It would lead to a conclusion that 68% of the sampled leases were going to fail the GAAP test and would be deemed capital leases. (TX 137 at 6). That information could be devastating for HPE, and Fowlis and other top executives at HPE never told DXC about that Duff & Phelps report. After learning of these problematic appraisal results, Fowlis and Joseph Dierdorf discussed whether to redo the lease conversions, but decided not to do so. (TX 24). Fowlis decided instead to transmit HPE's views about the appraisal methodology, to see if this would change Duff & Phelps' conclusions. Fowlis personally spoke to and emailed the Duff & Phelps appraiser about her decision to use the market sales approach as well as her decision to apply accelerated depreciation in the asset appraisal analysis. (TX 138). Fowlis also sent the Duff & Phelps appraiser a comparison of

Duff's fair value conclusions, with HPE's fair value conclusions.

A mere 3 days later, August 2, 2017, the Duff & Phelps appraiser replaced her own analysis methodology with that suggested by Fowlis, and sent HPE a second report in which the methodology had been changed to one that used Fowlis' methodology. The Duff & Phelps appraiser changed her accelerated depreciation curve to a straight-line depreciation method, which made the value drop more slowly over the life of the asset. (TX 139). The Duff & Phelps appraiser also deleted the market valuation appraisal method and changed it to a cost-approach, which also had the effect of increasing the assets' value. Hrg Tr. 1423:18-1423:25 (Fowlis). With Duff & Phelps' acquiescence to Fowlis' methodology approach, a new report was issued, in which the asset value was increased and dropped more slowly over time by changing the depreciation method. With a few phone calls and emails, Fowlis was getting the report that he wanted; with his input, the second Duff & Phelps report result had changed dramatically from the initial report, in which 2/3 of the leases failed the 90% Test, to a new report, where only 1 of the 25 sampled leases failed the 90% test of ASC 840. (TX 139).

After receiving Duff's second report, which now looked like only one lease failed the 90% Test, Fowlis told HPE's Dierdorf and Natali that HPE would "need to increase the Fair Value on the one lease contract by $5,000 to meet the 90% test." (TX 141). Fowlis again contacted the Duff & Phelps appraiser, who complied with his wishes, sending Fowlis a "revised summary of Fair Value" in which she reported that she "recategorized a few assets and the result is a slight increase to Fair Value." (TX 318). These revisions were put into a third report on the sample leases, which conformed to the result that HPE desired.

HPE sent only the third report to DXC on August 17, 2017, presented as an "independent" appraisal; HPE never told DXC about the previous two versions, which would

have shown that the appraisers had originally used their expertise to apply a totally different appraisal methodology (market approach with accelerated depreciation) in which the great majority of the leases had failed the lease conversion test of GAAP.  Hrg. Tr. at 1430:22-24 (Fowlis).  The fact that there had been earlier Duff & Phelps reports was only revealed when Jaclyn Cannici's deposition was taken days before the hearing commenced, and her documents and emails with HPE were produced.

After receiving the third Duff report, DXC sought assistance from two other valuation firms, DMC Valuation Group and Houlihan Lokey.  Both concluded that "fair value" was well below the "net book value" numbers used by HPE in converting the leases. Hrg. Tr. at 709:25-711:20 (Maciejewski).

### G.  The Lease Reclassification from Operating to Capital Leases

The August 2017 Duff & Phelps report did not convince DXC that HPE had properly converted the leases from capital to operating leases.  On September 22, 2017, Fowlis sent an internal email noting that "DXC has not yet acknowledged that HPE met the commitment in the merger regarding Capital Lease threshold and have not signed off that we successful [sic] converted Capital Lease[s] to Operating Leases." (TX 335).

In October 2017, DXC management concluded that GAAP required the Disputed Leases to be classified as capital leases.  The reclassification of the leases to reflect them as capital leases rather than operating leases occurred on October 30, 2017.  This reclassification was reflected in DXC's Q2 filing on November 8, 2017.  (TX 548 at 2).[11]

---

[11] HPE argues that the lease reclassification by DXC had the effect on DXC's reported financials of increasing DXC's reported earnings by $54 million in pre-tax income for the quarter.  (TX 1065 at 13).  But it also increased DXC's liabilities on its financial statement by $977 million and fixed assets by only $594 million. *Id.* While the Panel notes the argument, and also notes

### *H. The Lease Conversion File That Was Used by HPE in Performing the Conversions*

The DXC executives who had repeatedly sought information about how the lease conversions were performed never received from HPE its "Lease Conversion File" reflecting the actual method used in the HPE lease conversions done by HPE prior to the closing on March 31, 2017.

In performing its lease modifications, HPE's actual process used a "Lease Conversion File," which set out, *inter alia*, the calculations and data used for the 75% Test and the 90% Test. (TX 701). This Lease Conversion File was not produced to DXC until July 2018, in the course of this arbitration.[12] Only then was it clear to DXC how HPE had actually done the lease conversions, which was in stark contrast to the October 2016 White Paper's description of the methodology.

The Lease Conversion File showed that important data inputs used in performing the lease classification tests differed materially from those that HPE represented would be used in the October 2016 White Paper. Set forth below are the material differences between what HPE actually did in performing the lease conversions, as compared with the methodology represented

---

that DXC requested that its newly issued leases post-closing be issued by HPE as capital leases, (TX 1009, TX 1063, TX 1064), the Panel does not find this relevant to the issues before it. It does not relate to the pre-closing contractual obligation in the SDA to avoid transferring additional debt-like leases above the cap when the Transaction closed. This contractual duty was clearly inserted into the SDA to redress the impact of transferring capital lease debt obligations (which offloaded debt from HPE's balance sheet, and added that debt onto DXC's balance sheet). It is the accounting rules that govern liability under the SDA, and not a post-closing request for how to write new leases.

[12] HPE states that its Lease Conversion File was in its accountant's audit work papers – a voluminous work paper file that was provided to DXC's auditors at the end of March 2017. Hr. Tr. at 1601:14-1605:12 (Fowlis); Hrg. Tr. at 3993:19-25 (Cassidy). Whether or not this constitutes "production" of this key document, it was never drawn to the attention of the DXC executives who sought this type of information repeatedly, and received only "White Papers" in response. To be truly "cooperative," that document should have been promptly and clearly called out to DXC.

to DXC during the conversion process:

- Fair Value of Assets Under Leases Less than 2 Years Old: (90% Test): In the October 2016 White Paper, HPE represented that, in converting the $1.3 billion of capital leases to operating leases, it would use net book value ("NBV") only for leased assets for leases older than two years. (TX 79 at 6). For leases less than two years old, HPE represented that it would perform a "case-by-case" analysis of each lease to determine the fair value of the assets under lease. (TX 79 at 6). This was an important caveat to the use of net book value, because more than 75% of the leases were less than two years old. Hrg. Tr. at 1339:2-6 (Fowlis).

  o The Lease Conversion file revealed that no case-by-case analysis of the assets in any of the leases was ever done by HPE. HPE did not inform CSC/DXC about this highly significant deviation from the representations about lease conversion methodology promised to DXC in the October 2016 White Paper. Hrg. Tr. at 1340:9-15 (Fowlis);

  o HPE also used the present value of the remaining lease payment stream as its input for "fair value" for half of the leases, without ever informing CSC/DXC that this approach would be used. Hrg. Tr. at 1340:5-1342:8, 1343:2-7 (Fowlis). As will be explained further below, GAAP does not permit the use of the lease payment stream to determine the fair value of the actual asset under lease.

- Discount Rates (90% Test): In the October 2016 White Paper, HPE represented that it would use discount rates that were "materially consistent" with HPE-ES's borrowing rate for the purpose of buying the leased asset. (TX 79 at 7). Even though CFO Fowlis knew that under GAAP he had to use the *lower of* the implicit rate or the lessee's incremental

borrowing rate, Fowlis never assessed HPE-ES's incremental borrowing rate.  Since ES had no outside borrowing, he simply used the implicit rate for every lease. He did not tell CSC about this material difference between what HPE actually did in performing the lease conversions, compared to HPE's representation to DXC in the White Paper.  Hrg. Tr. at 1344:6-1345:7; 1343:19-23; 1345:5-7, 1353:13-22 (Fowlis).

- Useful Economic Lives (75% Test):  In the October 2016 White Paper, HPE represented that it would use the estimated useful economic life of assets listed in a table in the document. (TX 79 at 6).  But instead, the Lease Conversion File shows that HPE actually used a rote formula that had nothing to do with the actual economic life of the asset:  For leases shorter than 36 months, the estimated economic life of the leased asset was automatically set at 48 months; For leases longer than 36 months, the estimated economic life of the leased asset was automatically set at the total *lease term* plus 12 months. (TX 701); Hrg. Tr. at 1357:23-1359:3 (Fowlis).  This formula severed the economic life of the asset from the asset – it was based solely upon the length of the lease.  Thus, two identical computers leased for 2 years or 4 years would have entirely different "useful economic lives" based solely on the duration of the lease.  *Id.* HPE did not inform CSC/DXC about this material difference between what it represented to CSC and what HPE actually did. Hrg. Tr. at 1360:19-23 (Fowlis).

HPE's multiple material deviations in methodology – between the representations in the October 2016 White Paper and the actual conduct shown in the Lease Conversion File – would have raised serious red flags far earlier in the lease conversion process if CSC/DXC had been told about them.  There were many times when CSC/DXC's information inquiries could have been answered directly, and yet they were consistently and repeatedly bluffed and parried.

### *I. DXC's Indemnification Demand*

After concluding that the leases had not been properly converted from capital leases to operating leases, on November 8, 2017, DXC sent HPE an Indemnification Notice demanding that HPE indemnify DXC for $1.019 billion in Excluded Liabilities. (DXC Arbitration Demand at 24). HPE denied its indemnification obligation. This arbitration commenced in accordance with the dispute resolution process set out in the SDA and the additional Dispute Resolution Agreement entered into by the parties in March 2018.

## V.   ANALYSIS

### *A. Delaware Contract Law*

Under Delaware law, to prevail on a breach of contract claim, a claimant must demonstrate: "(1) a contractual obligation; (2) a breach of that obligation; and (3) resulting damages." *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. Ct. 2004), *aff'd*, 886 A.2d 1278 (Del. 2005). As the Claimant, DXC bears the burden of proving its claims by a preponderance of the evidence. *Id.* at 548. As the Respondent, HPE bears the burden of proving its Affirmative Defenses by a preponderance of the evidence.

Under the governing Delaware law, "[w]hen interpreting a contract, the court's role is to effectuate the parties' intent based on the parties' words and the plain meaning of those words." *Zimmerman v. Crothall*, 62 A.3d 676, 690 (Del. Ch. 2013) (citing *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006)); *see also Alta Berkeley VI CV v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) ("Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning."). Delaware Courts "will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty," and "[t]he true test is not what the parties to the contract intended it to mean, but what a

reasonable person in the position of the parties would have thought it meant." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

Indemnification provisions must be strictly construed against the indemnitee. *Alcoa World Alumina LLC v. Glencore Ltd.,* 2016 WL 521193 *7 (Del Super. Feb. 8, 2016).

"Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court." *NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007), aff'd, 945 A.2d 594 (Del. 2008). Thus, "'[i]n upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein. The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan." *GMG Capital Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012) (quoting *E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985)).

"If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). If a contract is ambiguous, however, a court may consider extrinsic evidence, including "evidence of prior agreements and communications of the parties as well as trade usage or course of dealing." *Id.* at 1233. "Contract language is not ambiguous simply because the parties disagree on its meaning." *E.I. du Pont de Nemours & Co., Inc. v. Allstate Ins. Co.*, 693 A.2d 1059, 1061 (Del. 1997). "Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc*, 616 A.2d at 1196.

In this case, both parties state that the contract is not ambiguous, although they disagree about the meaning of certain sections of it. That disagreement does not render the contract ambiguous under Delaware law cited above. Therefore, the Panel is guided by the terms of the contract in its consideration and in its ruling on each of the disputed issues discussed herein.

### B. Lease Classification Criteria

Whether or not HPE correctly converted the Disputed Leases is governed by US Generally Accepted Accounting Principles ("GAAP"). Accounting Standard Codification Topic 840-10-25-1 sets out GAAP for lease accounting to determine whether a lease is a capital lease or an operating lease. (ASC 840-10-25-1 is sometimes referred to herein as "ASC 840" as a shorthand reference to this section of section 840; where other sections of ASC 840 are mentioned, they are separately identified by their full number within the 840 section.) The purpose of the accounting tests set forth in this GAAP provision, is to make sure that a financial statement of a company accurately states whether a lease is a debt-like liability or simply an operating expense. If it is a capital lease, it is a debt-like liability, and must be reflected as such on a company's balance sheet. By contrast, an operating lease is treated as an operating expense of doing business, but does not have to be recorded as a corporate liability on the balance sheet.

The 4 GAAP tests set forth in subsections (a)-(d) are formulaic means to determine if a lease has sufficient earmarks of the purchase of an asset, with the corresponding obligation to pay for that asset. If it has those characteristics, it is a capital lease. ASC 840 sets forth 4 tests that a lease must pass in order to avoid being classified as a capital lease.

As stated above, HPE had approximately $1.3 billion of capital leases that were not shown on its financial balance sheet, because they were intercompany debts between HPE-FS, the lessor, and HPE-ES, the lessee. When HPE spun off ES, they were no longer intercompany

debts, because the debt was being transferred to DXC.  HPE could not transfer more than $250 million of capital leases to DXC under the terms of the SDA.  HPE's actions in performing its contractual duty and undertaking to convert these capital leases to operating leases needed to ensure that all the former capital leases were modified (subject to the cap) such that they would pass all four tests of ASC 840-10-25-1.  Passing each test is mandatory:  passing one, or even three, would not turn a capital lease into an operating lease under GAAP.  If the lease conversion process was not sufficient to pass all four tests, the lease remained a capital lease subject to the SDA's Indemnification obligation.

ASC 840-10-25-1 sets forth the tests.  It does not make any one test more important than any other test.

> A lessee and a lessor shall consider whether a lease meets any of the following four criteria as part of classifying the lease at its inception under the guidance in the Lessees Subsection of this Section (for the lessee) and the Lessor Subsection of this Section (for the lessor):
>
> a.  Transfer of ownership. [This provision is not applicable to this case.]
>
> b.  Bargain purchase option.  The lease contains a bargain purchase option.
>
> c.  Lease term.  The lease term is equal to 75 percent or more of the estimated economic life of the leased property.  However, if the beginning of the lease term falls within the last 25 percent of the total estimated economic life of the leased property, including earlier years of use, this criterion shall not be used for purposes of classifying the lease. [the "75% Test]
>
> d.  Minimum lease payments.  The present value of the lease term of the minimum lease payments, excluding that portion of the payments representing executory costs such as insurance, maintenance, and taxes to be paid by the lessor, including any profit thereon, equals or exceeds 90 percent of the excess of the fair value of the leased property to the lessor at lease inception over any related investment tax credit retained by the lessor and expected to be realized by the lessor.... [the "90% Test"]

ASC 840-10-25-1 (TX 351 at 1-2).

The focus of this arbitration is on these three lease classification tests: The Bargain

Purchase Option; The 75% Test; and The 90% Test. Each will be addressed in turn below. Subsection (b), referred to as the "Bargain Purchase Option Test," requires capital lease classification if the lease contains a bargain purchase option for the leased property. Subsection (c), the "75% Test," results in capital lease classification if the lease term is greater than or equal to 75% of the estimated economic life of the leased property. Subsection (d), referred to as the "90% Test," requires capital lease classification when the present value of the minimum lease payments is greater than or equal to 90% of the fair value of the leased property.

When leases are modified, as was done in the HPE conversion process, GAAP requires that each of the above tests be run twice – first as if the modified terms existed at lease inception ("Step 1"), and second, as of the modification date ("Step 2"). ASC 840-10-35-4 (TX 353 at 3). If any test indicates that a lease is a capital lease under either Step 1 or Step 2, GAAP requires that lease to be classified as a capital lease. ASC 840-10-35-4 (TX 353 at 3).

Another important principle that is involved in this arbitration is the fact that the leases were originally entered into by two subsidiaries of HPE; therefore, they are "related party transactions." The lease modifications were done entirely by HPE prior to the closing, and thus it had total control over the method used to classify this separation of the related party transactions. ASC 840-10-25-26 (TX 351 at 12) addresses "Classification of a Lease Between Related Parties," and sets out that "in circumstances in which it is clear that the terms of the transaction have been significantly affected by the fact that the lessee and lessor are related . . . the classification and accounting shall be modified as necessary to recognize economic substance rather than legal form."

## 1. *The Bargain Purchase Option Test*

Pursuant to ASC 840-10-25-1(b) a lease will be classified as a capital lease if it contains a

"bargain purchase option." The accounting standard defines a "bargain purchase option" as "[a] provision allowing the lessee, at his option, to purchase the leased property for a price that is sufficiently lower than the expected fair value of the property at the date the option becomes exercisable that exercise of the option appears, at lease inception, to be reasonably assured." ASC 840-10-20 (TX 1255 at 15).

Even absent such an explicit provision, Ernst & Young's lease accounting guidance ("EY Guidance")[13] explains that in some circumstances, "economic penalty creates a bargain purchase option," including situations in which the payment terms or the lease term create a "penalty" – an "economic disincentive for continuing to lease property is so significant that it is reasonably assured that the lessee will exercise the purchase option." EY Guidance, Section 2.4.2 (TX 546 at 55).

Determining whether a lessee would have been "reasonably assured" to exercise a purchase option under the modified leases centers on the economic incentives presented to the lessee by the lease arrangements. Here, DXC argues that several economic factors suggest that, at the time of lease modification, ES was "reasonably assured" to exercise the purchase option. DXC principally relies on its argument that the shortening of many of the Disputed Leases in an attempt to convert them to operating leases created a misalignment with the client contracts, because the modifications left customers with a longer corresponding contract, while shortening the lease term, and this misalignment would essentially compel such customers into a purchase option. Hrg. Tr. 4656:19-4658:7 (Summation Proceedings). DXC cites EY's lease accounting

---

[13] The EY Guidance will be referred to often, because both parties agree that EY is an important source of expert guidance on lease classification accounting. In addition, HPE uses EY as its auditing firm, and thus its own accounting firm's lease classification guidance, is particularly appropriate to apply to HPE's lease conversion process. The EY Guidance is also applicable to DXC, because its briefs frequently rely on EY Guidance as authority on lease classification.

guidance as providing that the "lease term should also be considered to determine if it is artificially short . . ., effectively creating a compulsion for the lessee to exercise what would otherwise be considered a non-bargain purchase option." EY Guidance (TX 546) Section 2.4.2.

DXC also argues that, in accounting for estimated residual values for the Disputed Leases, HPE did not apply its accounting policy of recording a "haircut" to the residual value, ordinarily used to account for uncertainty of technology value and the cost associated with recovering residual values associated with leased property at the end of lease term. This is some evidence that HPE was not expecting DXC to return the assets.

HPE responds that nearly half of the Disputed Leases did not have a purchase option; that the leases were amended as part of the conversion process to remove any right of the lessee to purchase at a bargain price; and where a purchase option did exist, it was modified to be an option to purchase at a negotiated price based on fair market value of the assets (in countries that permit buyout options). HPE also adduced evidence that it modified the terms of the leases to remove "UPM" caps – provisions that resulted in the transfer of ownership once the lessee made a pre-defined number of post-lease payments to the lessor – so that month-to-month renewals could occur in perpetuity without ownership of the assets ever transferring to the lessee. Hrg. Tr. 1171:13-21; 1173:19-1187:10 (O'Leary).

Weighing all of the evidence relevant to the Bargain Purchase Option, only portions of which are set forth above, the Panel finds that DXC fails to meet its burden to establish that the leases fail the Bargain Purchase Option Test. DXC asserts that the entirety of the leases failed this test, but its expert did not perform a lease-by-lease analysis to determine which leases might have failed due to a shortening that created an economic compulsion for the lessee to exercise a purchase option. Lacking such an individualized expert analysis, the Panel will therefore not

make a finding as to matters not included in an expert's report. Any such analysis would have required separating out which leases may have met the test, from those that did not. The Panel expects to have expert analysis on all issues that require the "specialized knowledge and expertise" standard of the Federal Rules of Civil Procedure.

While the Panel notes that in many cases, the lessees did not return the asset, without a lease by lease analysis to identify the reasons for the non-return, the element of economic coercion is lacking in sufficient evidentiary support. And, while there are leases in which the shortening of the lease term done in the lease modification did result in a "mismatch" between lease term and contract length, this would matter only in "dedicated leases" – those that are aligned to a single customer. Such a mismatch would not be a serious problem for "leveraged leases" – those that supply equipment used to provide services to multiple customers. According to evidence proffered by HPE, leveraged leases comprise about 55% of the Disputed Leases (TX 1629). Moreover, evidence was introduced that for ES's top 10 leasing customers, 50% of the contracts included lease terms that could be shortened and still service the existing contract. No countervailing factual evidence on this issue has been adduced.[14]

Based on the evidence presented by the parties, and the lack of any expert report analyzing the individual leases to determine which of the Disputed Leases fail the Bargain Purchase Option Test, the Panel finds that DXC has failed to meet its burden on this test and no award will be made to DXC under Subsection (b) of ASC 840-10-25-1.

---

[14]Although DXC cites "economic factors" purportedly showing that it had incentives to exercise a purchase option on some of the Disputed Leases, it fails to demonstrate that it had an economic compulsion to do so. Although the EY Guidance correctly states that economic penalty can create a bargain purchase option, the weight of the economic compulsion evidence does not show that the economic factors cited by DXC rise to the level of such a penalty.

## 2. *The 75% Test for Lease Classification*

ASC section 840-10-25-1(c) sets forth what is commonly referred to as the "75% Test"

under GAAP:

> c. Lease term. The lease term is equal to 75 percent or more of the estimated
> economic life of the leased property....

(TX 351 at 1).

Only DXC's expert performed the 75% Test. Thus, the Panel has no expert report from

any HPE expert that either performed this test, nor credibly disputed the manner in which DXC's

expert, Mr. Bialecki, performed the 75% Test. GAAP requires that **all four tests** be passed in

order to meet the GAAP requirements when converting a capital lease to an operating lease.

ASC 840-10-25-1 states: "[a] lessee and a lessor shall consider whether a lease meets *any*

of the following four criteria as part of classifying the lease at its inception . . .: (a) Transfer of

ownership. . . . (b) Bargain purchase option. . . . **(c) Lease term [75% Test].** . . . (d) Minimum

lease payments [90% Test]. . . ." ASC 840-10-25-1 (TX 351 at 1-2). To comply with this

section of the ASC accounting authority, all of these criteria must be considered and applied to

the leases at issue. Yet, HPE's expert, Mr. Ellis, was not asked by HPE to perform the 75% Test

in any of his four pre-hearing expert submissions. The Panel was exceptionally lenient in

allowing HPE to submit two supplemental expert reports by Mr. Ellis, after he had already

submitted his primary and his rebuttal expert reports; and the Panel permitted HPE to submit Mr.

Ellis' expert reports well past the deadline that applied to all expert reports. Notwithstanding this

multitude of reports, while Mr. Ellis rendered opinions on the other experts' inputs for the

accounting lease tests, (*i.e.*, the fair value, the discount rate and the economic useful life), he did

not perform the 75% Test. He opined that after reviewing DXC's experts report, only 9 leases

failed the 75% test that passed the 90% test. Hrg. Tr. at 4344:20-4346:20.

43

The Panel notes that the failure to perform the 75% Test reflects the decision by HPE not to request that Mr. Ellis apply the 75% Test to the Disputed Leases, despite asking him to submit 4 expert reports.   In both his opening and rebuttal reports, Mr. Ellis set out his "Assignment" that HPE gave him for expert analysis:  He was never asked to perform the 75% Test for the Disputed Leases.

This leaves HPE without a full expert calculation of the amount by which the leases passed, or failed, the 75% Test.  A calculation of the 75% Test is a necessary part of GAAP lease accounting.  Under the clear terms of the SDA, HPE committed to convert the $1.3 billion of capital leases into operating leases; it was its job and contractual commitment to do so and to do it in accordance with GAAP.  GAAP clearly and unequivocally requires that the 75% Test be passed, and yet HPE has chosen not to have its expert perform that test.  While HPE's experts differed on the economic useful life, none of HPE's experts challenged the correctness of Mr. Bialecki's methodology in performing the 75% Test.[15]

Under GAAP, the 75% Test requires that the remaining lease term (the numerator) be compared to the "estimated economic lives" of the leased assets (the denominator).  ASC 840-10-25-1(c) (TX 351 at 1).  If the ratio of numerator over denominator is greater than or equal to 75%, then the lease must be classified as a capital lease under GAAP.

"Estimated economic life" is defined in ASC 840 as "[t]he estimated remaining period during which the property is expected to be economically usable by one or more users, with normal repairs and maintenance, for the purpose for which it was intended at lease inception, without limitation by the lease term." ASC Master Glossary, "Estimated economic life" (TX

---

[15] While Mr. Furey submitted his opinion on the "economic useful life" element of the equation, he also did not perform the 75% Test.

1568 at 78).

The actual method used by HPE in its Lease Conversion file to determine an asset's economic useful life was an arbitrary formula, as stated above, which was completely divorced from the actual age of the asset. (TX 701). This formula was instead based solely on the length of the original lease term. Nowhere in GAAP can support for this methodology be found.

The HPE methodology using this formula violates GAAP, which requires that the asset – not the lease – have an "economic useful life" as an input into the 75% Test. The definition of "economic useful life" explicitly states that it must be determined "without limitation by lease term." ASC Master Glossary, "Estimated economic life" (TX 1568 at 78). Even HPE's own expert, Mr. Ellis, agreed that the estimated economic life should not be governed by the term of the lease and specifically stated that "if your only basis for your economic life is a calculation based on the lease term, that wouldn't be consistent with GAAP." Hrg. Tr. at 4434:22-4435:15 (Ellis).

HPE's estimated economic life input into the 75% Test is an arbitrary formula based on lease term rather than asset life. The Panel finds that HPE's method used in the Lease Conversion File to compute the economic lives of the leased assets is a methodological approach to the 75% Test that violates GAAP.

With a clearly incorrect methodology in the Lease Conversion File, and no expert of its own having performed the 75% Test, HPE pivots to a criticism of DXC's expert's calculation of the 75% Test.

DXC's expert, Mr. Bialecki, "performed the 75% Test (including Step 1 and Step 2) for the assets associated with the Disputed Leases." Bialecki Rep. (TX 1250) at 34. In performing the 75% Test, Mr. Bialecki relied on the economic lives identified as the recommended asset

usage created by HPE's own Information Technology Organization, (hereinafter referred to as the "ITO" group). This is the professional group at HPE that was historically responsible for managing the Leased assets. Bialecki Rep. (TX 1250) at 35; Hrg. Tr. 1652:4-25 (Davis). These ITO estimates of useful economic life, coming straight from HPE's own employees' records, constitute an admission by HPE as to what the actual economic useful lives of the assets are. (TX 1007).

HPE offered the expert opinion of Mr. Furey for the economic life input. Mr. Furey's analysis agreed with Mr. Bialecki for certain categories of equipment and differed on others. But Mr. Furey's analysis and HPE's argument rest on the rejection by HPE of its own "useful life" estimates created by its ITO group. Instead, HPE argues that the ITO figures should be increased based on the "sweating"[16] of those assets by HPE. In this argument, HPE attempts to impeach the accuracy of its own ITO evidence.[17]

In order to provide HPE the opportunity to support its argument with records showing the amount of time that asset categories were "sweated," the Panel's Post-Hearing Information Requests asked for data kept by HPE that would show the amount of "sweating" that occurred, by asset category, so that the Panel could evaluate whether to augment the ITO estimates of economic useful life. And because this division had been spun off in the Transaction, the Panel required both parties to cooperate in responding to this Panel Request.[18]

---

[16] "Sweating" is a term used by HPE to refer to assets that had some amount of continued usage after they have been returned by the lessee.

[17] The October 2016 White Paper showed a range for the economic useful lives. (TX 79). Mr. Furey relied on that document in part. However, the ITO "recommended asset usage" does not have the range of lives reflected in the White Paper. The ITO figures are only reflected in the White Paper as the lowest economic life value listed. (TX 1007).

[18] HPE's claims that the production of this "sweating" data was the responsibility of DXC is baseless; it was clear that the Panel sought to have the parties cooperate regardless of where the documents were kept.

46

In response to the Panel's request, it was revealed that no data was kept about the duration of "sweating" nor how many leased assets were, in fact, "sweated" after their return to HPE, nor which type of assets were "sweated." Such records were not maintained by HPE in the ordinary course of business.

The only evidence about "sweating" comes from Colleen Davis' testimony about an anecdotal conversation with her boss at HPE, while she was participating in drafting this section of the White Paper. *See* Hrg. Tr. at 1653:4-8 (Davis). Ms. Davis, a former HPE employee at the ES division now employed by DXC, explained that she asked her superiors how long to say that the assets were "sweated" because there was no data; they discussed their experience on use after return and concluded to include a 12-24 month additional period in the October 2016 White Paper. *See* Hrg. Tr. at 1654:9-25 (Davis). As Ms. Davis testified, the HPE executives understood that a longer "sweat" meant a longer economic useful life, which would help HPE pass the 75% Test. *See* Hrg. Tr. at 1653:21-1654:8 (Davis). Thus, this one conversation, concededly not based on data, is all that exists to support the "sweating" argument pressed by HPE to enlarge its own ITO Group's useful life estimates. The Panel finds that the best estimates of economic useful life are those kept by the HPE ITO Group before there was any self-interested motivation, and that insufficient reliable evidence exists to enlarge each asset category's useful life by an amount to account for "sweating."

The Panel will accept Mr. Bialecki's useful economic life figures, which enlarged one asset category's useful life "in an effort to be conservative." Bialecki Rep. (TX 1250) at 36. That is the most accurate calculation of estimated economic useful life that is supported by the evidence in the case, because it relies on HPE's ITO Group's estimates, created during the normal course of business and not in anticipation of litigation.

47

This evidence and testimony support the Panel's finding that Mr. Bialecki's estimated useful life calculations are appropriate. No persuasive evidence was presented of "sweating." HPE's expert, Mr. Ellis, also testified that Mr. Bialecki's useful life estimates were "within the range." (Hrg. Tr. at 4436:8-11 (Ellis)).

Mr. Bialecki's method of calculating assets' economic lives is consistent with GAAP. ASC 840 defines economic useful lives to be "[t]he estimated remaining period during which the property is expected to be economically usable by one or more users," (TX 1568 at 78), and the ITO's historical data for leased assets comports with this definition.

Considering all the evidence adduced by the parties, the Panel finds that DXC has met its burden of proof that the number of leases that failed the 75% Test for lease classification as an operating lease, and therefore remained capital leases, are those identified by Mr. Bialecki using his estimates of economic useful life.  The calculations performed by Mr. Bialecki are proper and in compliance with GAAP, and HPE's lease conversion methodology did not comply with GAAP.

Thus, the Panel rules, as a separate and independent ruling, that DXC's 75% Test calculations are supported by a preponderance of the evidence and that the leases that remain capital leases under the 75% Test as calculated by Mr. Bialecki shall be indemnified by HPE to DXC. This ruling is subject only to the application of the Panel's ruling on whether Mr. Bialecki's calculation of the amount to be indemnified is as of the Distribution Date or the Reduction Period date, which will be set forth below.

### 3.   *The 90% Test for Lease Classification*

ASC section 840-10-25-1(d) sets out what is commonly referred to as the "90% Test" under the GAAP standard:

     d.     Minimum lease payments.  The present value of the lease term of the minimum lease payments, excluding that portion of the payments representing executory costs such as insurance, Maintenance, and taxes to be paid by the lessor, including any profit thereon, equals or exceeds 90 percent of the excess of the fair value of the leased property to the lessor at lease inception over any related investment tax credit retained by the lessor and expected to be realized by the lessor....

(TX 351 at 2).

The 90% Test compares the present value of the minimum aggregate lease payments (the numerator) with the fair value of the leased assets (the denominator).  ASC 840-10-25-1(d) (TX 351 at 2).  If the ratio of the numerator over the denominator is greater than or equal to 90%, the lease must be classified as a capital lease.

Under GAAP, to calculate the present value of the lease payments, a lessee must use a discount rate equal to the lower of: (i) the lessee's incremental borrowing rate, or (ii) the implicit rate calculated by the lessor if such rate is known to the lessee.  ACS-840-10-25-31 (TX 351 at 14).

GAAP further states that the "fair value of leased property" reflects "[t]he price for which the property could be sold in an arm's-length transaction between unrelated parties."  ASC Master Glossary, "Fair value of lease property" (TX 1568 at 85).

There are significant differences in the experts' methodologies used to determine the multiple inputs that comprise the equation that is the 90% Test.  The Tribunal has heard testimony, read expert reports, and considered hundreds of documents that pertain to the 90% Test.  The Panel will apply the inputs for each variable of the 90% Test that it finds the most persuasive and consistent with the accounting authorities.

     a.     **Discount Rate: Input Into the 90% Test**

GAAP requires that the discount rate used to calculate the present value of the lease

payments for the 90% Test must be **the lower of** (i) the lessee's incremental borrowing rate, or (ii) the implicit rate calculated by the lessor, if such rate is known to the lessee.  ACS-840-10-25-31 (TX 351 at 14).

When, as is the case here with HPE-ES, a lessee does not have any stand-alone borrowings (because HPE-ES's rates reflect intercompany transactions with HPE-FS), the interest rate of the parent entity (HPE) should generally be used.  According to the accounting guidance published by Ernst & Young, HPE's accountants:

> **Subsidiaries' incremental borrowing rate**
>
> The intercompany rate on loans from the parent to the subsidiary generally *should not be used* as the lessee's incremental borrowing rate for purposes of classifying a lease.  The rate used by the subsidiary should reflect the incremental borrowing rate of the parent, unless the subsidiary is able to obtain financing on a stand-alone basis without the parent or other entities guaranteeing debt.

EY Guidance (TX 546 at 78).  HPE's expert, Mr. Ellis, has authored a lease accounting treatise that agrees that this is the proper approach for such intercompany transactions.  Mr. Ellis writes:

> The issue is whether the incremental borrowing rate for a lease entered into by a subsidiary should be based on the subsidiary's incremental borrowing rate or that of the parent. In most cases, the rate should reflect the incremental borrowing rate of the parent unless the subsidiary does financing on a standalone basis (i.e., without guarantees from its parent); an intercompany rate on loans from the parent to the subsidiary should not be used to classify the lease.

CCH Accounting for Leases (TX 177 at 17-18).[19]

In the October 2016 White Paper, HPE stated: "We used a range of discount rates that

---

[19] While Mr. Ellis attempted to distinguish the applicability of his own Treatise in testifying on behalf of HPE about why the intercompany rate could be used, his testimony was unpersuasive, and much of it rested upon a series of exhibits TX 1615, 1616, and 1617 to which the Panel has determined to give no weight, because it learned after the hearing that Mr. Fowlis had altered those exhibits, as discussed below.

varied based on country and is reflective of the term of the underlying leases. We also believe this rate is materially consistent with the interest cost ES would have incurred on debt obtained over similar term for the specific purpose of acquiring the leased asset." (TX 79 at 7). Again, HPE did not do what it said it would do. Instead, HPE used the implicit rate for every lease being converted without calculating the *lower* of the ES incremental borrowing rate and the implicit rate, which GAAP requires. And HPE never told CSC that it was doing so. Hrg. Tr. at 1343:19-23; 1345:5-7; 1353:13-22. (Fowlis). Thus, HPE did not perform the analysis required under GAAP, and its approach was, in fact, inconsistent with GAAP.

There is no dispute that ES did not have any independent borrowing. Nor is there any dispute that GAAP requires the application of the *lower* of the ES incremental borrowing rate and the implicit rate for the 90% Test. Nor can there be any dispute that when a subsidiary does not have an independent borrowing rate, the accounting authorities instruct that generally the proper approach is to use the borrowing rate of the parent company, HPE, as the incremental borrowing rate of the subsidiary. (TX 177 at 17-18; TX 546 at 78). In doing the lease conversions, HPE did not use its own incremental borrowing rate as the incremental borrowing rate of HPE-ES, nor did it compare that rate to the implicit rate of the lease, and apply the *lower of* those two rates when inputting the discount rate into the 90% Test.

Mr. Ellis, HPE's expert, attempted to justify the manner in which HPE deviated from the general principles stated by the GAAP accounting authorities in deciding to use the implicit rate for all the leases, rather than applying the lower of that rate and the incremental borrowing rate of the parent company. Mr. Ellis opined that approximately 4,000 of the leases were full payout leases in which ownership transferred upon satisfaction of the required payments. He reasoned that for those leases the implicit rate charged by HPE-FS to HPE-ES was the equivalent of

financing the purchase through the lease, and therefore equivalent to ES's incremental borrowing rate. In other words, it was the rate at which ES could theoretically borrow the funds necessary to purchase the leased assets. Since the full payout lease is the purchase of the assets by the lessee, the rate implicit in a full payout lease is the actual borrowing rate for the assets underlying the specific lease. Rebuttal Report of Jeffrey Ellis ("Ellis Rebuttal Rep.") (TX 179) ¶29.

The Panel notes that the purported borrowing rates used by HPE are not properly used as the discount rate for a variety of reasons. First, they were unreasonably high even on some of the full payout leases. Mr. Ellis, HPE's expert, could not justify their use and instead used DXC's expert, Mr. Bialecki's, discount rate for at least 802 of the leases. Ellis Rebuttal Rep. (TX 179) ¶30. Mr. Ellis further concluded that 929 leases failed the accounting tests largely because they were not full payout leases and so his discount rate analysis was not applicable. Thus, Mr. Ellis conceded that the discount rate he proposed be used is not applicable to some of the leases and that the discount rate used by Mr. Bialecki was acceptable for many of the leases.

Second, the EY Guidance, as well as Mr. Ellis' own lease accounting treatise, caution to be highly skeptical of using intercompany loan rates in setting the discount rate. Yet, HPE used the intercompany rates from HPE-FS to HPE-ES as the basis for its discount rate, which is contrary to the guidance of its own accounting firm, EY. Even if one were to consider it appropriate to look to intercompany interest rates, it would be necessary to first find that the interest rate was not impacted by the relationship and that ES could not obtain lower rates from other suppliers. However, this assumption is not supported by the facts. In the time period after ES was spun off from HPE, it has been able to independently negotiate lease terms and has been able to obtain interest rates markedly lower than the rates charged by HPE-FS. Hrg. Tr. 2109:12-

52

2111:22 (Diggins). The same was not true prior to the spin/merge, such that the interest rate that FS charged ES was not a genuine proxy for ES's borrowing rate. Colleen Davis, who worked for both HPE and DXC, testified that HPE-ES's ability to negotiate was extremely limited, because ES was required to finance its leases through the FS subsidiary. At times ES would get cheaper rates from other providers and endeavor to use that as leverage to reduce the rate from FS but was denied and told that it was in the best interest of HPE to keep the money in-house. Hrg. Tr. at 1643:18-1644:24 (Davis). HPE-ES simply could not go out into the market for genuine arm's-length borrowing rates.

Mr. Diggins, who also worked for both HPE and DXC, similarly testified that ES had no authority to negotiate prices and that occasionally ES received unsolicited quotes from other companies even when it was a subsidiary of HPE and the rates charged by those companies to ES were lower than the rates charged by FS. Hrg. Tr. 2005 :12-2007:19 (Diggins).

Recognizing that the accounting literature states that intercompany rates on loans from the parent to the subsidiary generally should not be used for the incremental borrowing rate for these purposes, Mr. Ellis endeavored to assess whether the rates charged by FS to ES were similar to those charged by FS to other customers to support his position. For that purpose, he reviewed TX 1615, 1616, 1617, one for each fiscal year, 2016, 2017, and 2018, which purported to provide implicit rate data for the lease arrangements with all of FS' customers. HPE contends that these exhibits purport to state the lessor yields from the rates that HPE-FS charged to third parties and the intercompany rates that FS charged to ES. HPE Post-Hrg. Br. at 32.

However, the Panel learned after the hearing, in response to its Panel Information Requests, that Fowlis had personally altered TX 1615 before submitting it to HPE's expert and before submitting it to counsel to introduce into evidence at the hearing. This alteration also

affected TX 1616 and TX 1617 as well. The Panel gives no weight to TX 1615, TX 1616 or TX 1617 for this reason. While HPE argues in its post-hearing briefs that the data in these altered exhibits is the same as the data in the underlying documents, those underlying documents were never introduced into evidence, were not produced in discovery, and have never themselves been authenticated. Therefore, reliance on unauthenticated documents to rehabilitate documents that were admittedly altered by HPE's CFO does nothing to lend any weight to the altered documents.

Mr. Fowlis was cross-examined intensively at the hearing about TX 1615, with very specific questions about how that exhibit was created.[20] The Panel was sufficiently concerned about the witness' answers during this colloquy at the hearing that it asked a series of questions about TX 1615 in its post-hearing Panel Information Requests. The Panel asked:

> For the Native file of TX 1615, please answer the following questions stated orally during the hearing: On what dates was the document modified since the closing of the transaction between the parties and prior to the litigation? On what dates since the litigation commenced was it modified? What modifications were made on each such date? What was the "before" and "after" of each modification? Who made the modification? When was this document in Native form made available to DXC? When was this document in Native form made available to HPE experts? When and in what format was this document produced to DXC during discovery in this case?

---

[20] During the hearing in this matter, Mr. Fowlis was questioned closely about these documents during cross-examination. He was asked regarding TX 1615, "This existed before the litigation?" and he answered "Yes," under oath. Hrg. Tr. at 1587:6-1588:12 (Fowlis). When the cross-examining attorney followed up: "I'm not asking if the data existed. Did this report exist, in this form, before this litigation?", Mr. Fowlis responded: "This report is delivered to me every month as part of the standard business reporting. From the business. Now, it's a big file with a pivot table off of to review and slice however you want. This data we received every single month." Hrg. Tr. at 1587:9-18 (Fowlis). When he was then asked, "Did somebody ask you to pull . . . a certain pivot table off of that report that you get?", Mr. Fowlis testified, "No, it comes to me." Hrg. Tr. at 1588:3-10 (Fowlis). DXC's counsel then asked: "In this form?" And Mr. Fowlis responded, "In this form, yes." Hrg. Tr. at 1588:11-12 (Fowlis). His answers to the final two questions were not candid because, as the Panel learned only later, Fowlis had altered the exhibit, and it did not come to him in that form.

Panel Requests at 4-5.

The responses confirmed that the documents had been altered by Fowlis in certain respects shortly before the hearing, and it was upon those altered documents that Mr. Ellis had provided his analysis. *See* April 5, 2019 Responses to Panel Requests at 10-18. While Mr. Ellis could compare numbers, he was not in a position to authenticate HPE documents and so could not verify any of the documents underlying TX 1615, TX 1616, and TX 1617. Hrg. Tr. 44774:1-4477:25 (Ellis).

When this alteration by Fowlis came to light after the hearing, HPE submitted further documents that had not been put in evidence at the hearing, in an effort to provide support for their argument that TX 1615, TX 1616, and TX1617 be found to be authentic and given weight. The Panel does not accept new documents into evidence after the hearing closed. These purported "underlying documents" have not themselves been authenticated, nor has any testimony been received about them. The Federal Rules of Evidence govern this arbitration. After considering HPE's arguments made in an effort to rehabilitate an altered exhibit, the Panel has made a determination to give no weight to TX 1615, TX 1616, and TX 1617.

HPE argued in summation that Mr. Fowlis' document alterations are insignificant because "the yield data is identical and was not manipulated or changed in any way [from the "ordinary course" versions of these documents.]." HPE Post-Hrg Reply Br. at 13 n. 3. This argument is groundless. A document alteration that is not disclosed is a very serious matter. The argument also collapses because it rests upon alleged newly discovered purported "ordinary course" versions of other documents that were never submitted as exhibits at the hearing; never produced by HPE in discovery; never tested at depositions; nor cross-examined at the hearing. Such purported documents themselves, remain unauthenticated and they are not in evidence in

this record.[21] Thus, no argument based on them is given weight.  In sum, exhibits numbered TX 1615, TX 1616, and TX 1617 are not authentic documents because they were altered from the original, and the alteration was concealed by HPE.  Therefore, any opinions and arguments based upon them, will be afforded no weight in supporting HPE's arguments in this case.

In light of the facts adduced from the witnesses as to ES' inability to negotiate for lower rates while it was part of HPE, even if these exhibits had not been altered, and even if the Panel were to accept Mr. Ellis' conclusion based on TX 1615, TX 1616, and TX 1617 that the rates charged to ES were the same as the rates charged to other lessees, it would not necessarily serve to establish what incremental borrowing rate ES could have obtained in the marketplace.

The Panel is guided in its consideration by the objective EY Guidance, which states that the "intercompany rate on loans from the parent to the subsidiary generally should not be used as the lessee's incremental borrowing rate for purposes of classifying a lease."  EY Lease Guidance (TX 546 at 78).  Such intercompany rates "don't necessarily reflect market rates," and should be viewed "with a healthy sense of skepticism," as even Mr. Ellis admitted during the hearing. Hrg. Tr. at 4416:9-18 (Ellis).

The EY Guidance states that for GAAP lease accounting, when inputting the proper

---

[21] Counsel's argument that the underlying documents were "not manipulated or changed" from the purported "ordinary course" versions rests on no evidentiary foundation.  The date of creation, form of creation, and chain of custody of the purported "ordinary course" versions are unknown, and no evidence supports counsel's assertions about their reliability.  Thus, there is no evidence in this record to support the assertion that these are "ordinary course" documents.

HPE counsel may not argue that an altered document is entitled to weight because it is based on other purported documents that are not part of the record in this case, and thus were not subjected to the rigors of cross-examination at the hearing.  The Panel gives no weight to such an argument, not because counsel lacks ingenuity, but because counsel is relying on documents not in evidence.  The Rules of Evidence govern this arbitration, and documents that are not in evidence cannot be the basis for legal argument.

discount for the 90% Test, HPE should have used the parent's (HPE) borrowing rate as a proxy for ES's incremental borrowing rate because HPE-ES did not have its own stand-alone borrowings. Fowlis did not do so in his lease conversions, and this was an error in GAAP methodology.

HPE's use of the lessor yield rates also violates the GAAP requirement to use **the lower of** the implicit rate or the incremental borrowing rate of the parent, rather than its yield as lessor.

The Panel finds that the discount rate used by HPE in the lease conversions, as well as the proposed discount rate it urges the Panel to apply, are not supported by GAAP. Further, their reliance on TX 1615 raises serious credibility concerns that undermine any weight to be accorded to HPE's arguments with respect to the proper discount rate to apply in the 90% Test.

The Panel finds persuasive the discount rate used by Mr. Bialecki for the 90% Test. DXC's expert identified "actual interest rate yields for HPE's borrowing and for borrowings of its former parent, Hewlett-Packard Company ('HP')," and found that these "ranged from approximately 1.7% to 5.7% from January 2011 through March 2017." Bialecki Rep. (TX 1250) at 33. As noted above, Mr. Ellis also adopted those rates for many of the leases he analyzed. Determining that to be ES's incremental borrowing rate in accordance with the accounting guidance, Bialecki compared that rate to "the interest rate implicit in the lease calculated by HPE-FS and used ES's parent's lower rate pursuant to ASC 840-10-25-31." *Id.*

The Panel finds that DXC's methodology in calculating the discount rates used for the 90% Test comports with the GAAP requirements, and it finds that DXC has met its burden of proof with respect to this input for the 90% Test.

      b.    **Fair Value of the Leased Assets: Input into the 90% Test**

Under GAAP, the "fair value of leased property" is "[t]he price for which the property

could be sold in an arm's-length transaction between unrelated parties." ASC Master Glossary, "Fair Value of Leased Property." (TX 1568 at 85). Each side's experts take very different approaches for their fair value analysis. HPE's valuation expert, Mr. Furey, uses "Reproduction Cost" for his 90% Test methodology. Expert Report of Patrick Furey ("Furey Rep.") (TX 160-Furey) at 30. DXC's expert, Mr. Dight, uses the "Market-Based Approach" (also known as the "sales comparison approach") in his 90% Test analysis. Expert Report of D. Gregg Dight ("Dight Rep.") (TX 1191) at ¶ 69.

These approaches to valuation are very different, and the Panel must decide which one better fits the leased assets in this case.

The Reproduction Cost methodology applies a method based on the cost of "reproducing a new replica of the asset being appraised using the same or closely similar materials." Furey Rep. (TX 160-Furey) at 31. It is a mathematical approach in which reproduction costs are estimated by applying a price adjustment derived from published industry indices, such as the Consumer Price Index, to historical acquisition cost to estimate a value as of the valuation date. Furey Rep. (TX 160-Furey) at 31; *Valuing Machinery and Equipment* (TX 1581) at 50.

In the Market-Based Approach, an appraiser estimates value of a given asset by reference to and analysis of recent sales of similar assets ("comparable sales"). *See* Dight Rep. (TX 1191) at 17. This approach "focuses on the actions of actual buyers and sellers," and "measures the loss in value from all forms of depreciation and obsolescence with are inherent in the individual asset." Dight Rep. (TX 1191) at 18.

ASC 840-10-25 does not specify the valuation method to be used for determining the fair value component of the 90% Test, but the authorities provide that if sufficient reliable market data regarding comparable sales is available, the market-based approach is the preferred method

of appraisal. Dight Rep. (TX 1191) at 18. According to the manual, titled *Valuing Machinery and Equipment: The Fundamentals of Appraising Machinery and Technical Assets, third edition*, which is prepared for use by expert appraisers, and is published by the American Society of Appraisers, "the used equipment market . . . is often (but not always) the most reliable method of determining certain types of value for certain types of properties."[22] ("MTS Fundamentals") (TX 720) at 93.

The Reproduction Cost approach, on the other hand, is very rarely used. HPE's expert acknowledged this when questioned by the Panel. When Mr. Ellis was asked by the Tribunal how often he had used the Reproduction Cost method of valuing assets, he answered: "In my experience, I've actually only seen one instance that I can think of sitting here today where a company has had to use the [reproduction] cost approach because it was a client that had a device that was used in gaming centers." Hrg. Tr. at 4256:11-17 (Ellis). In the one instance in which he had ever used it, the client "would not sell that asset" because it "had proprietary technology in it." Hrg. Tr. at 4256:11-4257:16 (Ellis). Mr. Ellis has been an accountant for over 30 years, was a contributing author on the ASC 840, has done a great many valuation assignments involving appraisals, was deeply involved in appraisal work during the savings & loan crisis, and has authored a CCH treatise on lease accounting. Yet only once in his long and distinguished career could he recall ever using reproduction cost methodology to determine the fair value of an asset. And even then, it was for a highly unusual asset. Hrg. Tr. at 3850:15-3858:11; 4256:11-17 (Ellis).

---

[22] The full text of this section provides: "The used equipment market is an established means of buying and selling equipment. The used market consists of used machinery dealers, auctions, and public and private sales, and it is often (but not always) the most reliable method of determining certain types of value for certain types of properties." *MTS Fundamentals* (TX 720) at 93.

By contrast, the assets under lease in this case are computers, laptops, servers, and similar commonly used technology equipment. While it can be customized for customer needs, it is not unique equipment, and it is often resold. The Panel concludes that Mr. Furey's Reproduction Cost approach is not a logical choice for the methodology to determining fair value in this case. The Panel recognizes HPE's position that there is little turnover in this kind of equipment in the first two years, making market valuation more difficult, but no appraisal approach is an exact and precise science, especially with thousands of assets to appraise. The Panel finds that the Market-Based Approach is widely used and far better fits this case than Reproduction Cost.

In his market-based valuation of fair value, DXC's expert, Mr. Dight identified the prices at which used versions of the thousands of asset parts were offered for sale in the secondary market. Hrg. Tr. at 2640:9-2645:16 (Dight). Mr. Dight used well-accepted data sources for his secondary market pricing. Specifically, Mr. Dight contacted over 150 sources of market data and relied on thousands of data points, including sales offers, sales of identical or similar assets, data aggregators (such as Orion Blue Book) and knowledgeable market participants. Hrg. Tr. at 2617:12-17; 2638:23-2639:5; 2639:19-2640:7; 3052:7-25; 3054:7-24 (Dight). Although HPE criticizes some of the sources used by Mr. Dight, its own advisors at PwC have used some of these same sources (including Orion Bluebook) in their valuations. Dight Rep. (TX 1191) at 56-58. In addition, HPE's own expert, Mr. Furey, testified that his firm subscribes to Orion Blue Book, and that he and his firm have used Orion Blue Book data for fair value analysis. Hrg. Tr. at 3668:6-25 (Furey).[23]

---

[23] While a small number of valuations were listed with a source on eBay, this was not the source of the vast majority of the market value data. Moreover, internet sources such as eBay are often used by reputable resellers of such technology equipment, and the decision to present a small number of data points from eBay does not undermine the work done by Mr. Dight.

Mr. Dight then assigned an "effective age" to each asset and constructed a "depreciation curve" for that part number. After constructing 635 individual curves, Mr. Dight combined those curves to extrapolate depreciation curves for the other number models that were not included in his samples, and applied the depreciation curves to the Original Equipment Cost ("OEC") of the individual part numbers to arrive at the fair value of the assets. Hrg. Tr. at 2640:9-2645:16 (Dight); Dight Rep. (TX 1191) at ¶ 109. The parties agree that OEC was the correct data point for original cost of the asset to HPE, and both experts used that data in some way in their respective analyses. Hrg. Tr. 2767:16-2770:11 (Dight); Furey Report.

HPE raised various criticisms of Mr. Dight's analysis including criticism of his use of a "market derived replacement cost approach" for 25% of the assets, the absence of proper recording in his work files, that there was little actual evidence of prices during the first 18 months making his conclusions unreliable, that there were anomalies revealed on examination of some of Mr. Dight's numbers, that the OECs for the same part varied sometimes widely, that Mr. Dight's assessment of "effective age" was subjective, and that Mr. Dight used an insufficient number of comparables. The Panel has considered all of these criticisms. This was not an easy assignment with thousands of individual pieces of equipment to be valued and over successive periods of time to establish the depreciation curves for each. The Panel finds that Mr. Dight's work was consistent with the requirements of his field as set forth in *MTS Fundamentals*, the bible for valuation and appraisals. In light of the fact that the Market Approach is the preferred approach to valuation and in light of the rare situations in which the Reproduction Cost approach is appropriate, the Panel accepts Mr. Dight's valuations.

The Panel also finds that Mr. Dight's method that applied an accelerated depreciation curve, which emerged from his market based approach with prices obtained from the secondary

market (rather than the straight line depreciation used by HPE's expert) is the most appropriate method to use when valuing technology assets, such as those here.  Straight line depreciation does not comport with the reality of what generally occurs with IT equipment assets that are in a rapidly changing era of technological advances.  Indeed, even HPE's own accounting firm's expert on lease accounting, Betty Davis, questioned HPE's use of straight-line depreciation in valuing these assets.  (TX 150 at 6). The Panel does not find that Mr. Furey's use of straight-line depreciation was consistent with GAAP, because he based that approach at least in part on the fact that "lease payments" accrue to the lessor linearly over time.  Hrg. Tr. at 3672:18-3674:5 (Furey).  This is inconsistent with GAAP, and independent accounting guidance, both of which prohibit the use of the lease payment stream to value assets.

Outside appraisal firms also used accelerated depreciation curves in their sample analyses.  Duff & Phelps' first choice was to apply an accelerated depreciation curve, stating that "market data that supports the depreciation curves shows a steeper decline in the first few years than the straight-line depreciation curve that is being used to calculate NBV." (TX 138 at 1).  The independent appraisal firms Houlihan Lokey and DMC Valuation Group also used accelerated depreciation curves when valuing these tech assets.  Hrg. Tr. at 71:9-17; 711:15-17 (Maciejewski).

DXC's valuation expert used a market-based appraisal and concluded that the assets depreciate in curves that drop rapidly early in their lives.  Hrg. Tr. at 2619:16-2620:20 (Dight).  The Dight method using accelerated depreciation is also supported by Mr. Martin, a PwC witness, who also pointed to market data showing a steep decline in value early in the asset life.  (TX 166-Martin).  HPE's own PwC advisors and EY's leasing expert also questioned using straight line depreciation.

Following the hearing, HPE urged that DXC's expert Mr. Dight should have applied his depreciation curve to replacement cost new ("RCN"), rather than to original equipment cost. ("OEC"). But the Panel was not provided with any expert report criticizing this methodology or applying the curves to Replacement Cost New.  Instead, HPE sent the Panel reams of raw data, after the Panel struck HPE's impermissible attempt to introduce such expert analysis for the first time after the hearing had concluded.

This case applies the FRCP and Federal Rules of Evidence. The very purpose of FRE 702 is to treat methodology that is based on specialized "knowledge, skill, experience, training, or education" as the realm of experts.   HPE made a strategic decision to ask its expert to use only the reproduction cost approach, and *not* to ask its expert to submit an expert report challenging Mr. Dight's analysis on this basis or applying his depreciation curves to his Replacement Cost New conclusions.[24]

---

[24] In its Post-Hearing Information Requests, the Tribunal requested that Mr. Bialecki do certain calculations for a limited set of assets, that applied Mr. Dight's depreciation curves to his model's Replacement Cost New data that had been used by Mr. Dight in developing depreciation curves for a subset of asset models.  The Panel makes no findings based on those calculations which had not been presented at the hearing and does not rely on them in any way. HPE asked the Panel to permit it to submit the calculation for all assets in the case, using a methodology stated only in an attorney's letter to substitute for certain data to supplement these calculations, and the Panel explicitly denied that request. *See* March 21, 2019 Panel Letter. Notwithstanding that express denial, HPE proceeded to include charts in its post-hearing brief that were clearly the result of calculations done by an HPE expert that had not produced any expert report using such calculations.  This was improper, and the Panel struck those HPE submissions explaining its reasons. *See* May 6, 2019 Panel Ruling on Motion to Strike.  The Panel ordered HPE to redact its briefs to omit any reference to these improperly submitted expert calculations submitted for the first time after the hearing and so lacked any expert analysis as well as any indicia of reliability that comes with testing by expert rebuttal, deposition, and cross-examination.  The resubmitted briefs then simply replaced the struck exhibits with an entire box of raw data. However, this raw data means nothing without an expert report analyzing that raw data, tested by rebuttal report and cross examination.  It does not change the fact that HPE has submitted no expert report that opined on the validity of Mr. Dight's depreciation curve methodology, nor provided a reasoned basis for urging the application of the curves to Replacement Cost New.

While HPE submitted data in the form of voluminous raw data exhibits with many thousands of entries in computerized spreadsheets, a crucial gap exists: HPE has no supporting expert report explaining why Mr. Dight's methodology in creating depreciation curves was flawed, nor any expert who timely submitted an expert report analyzing that raw data. FRE 702 requires that this type of expert analysis must be supported by an expert report submitted in advance of trial, with the opportunity for the adversary to submit a rebuttal expert analysis, and permitting the fact finder to hear testimony on direct and cross examination at trial.

All HPE can point to is a short colloquy during Mr. Furey's testimony at the hearing. Hrg. Tr. at 3628:5-3630:2 (Furey). But this criticism was never stated in Mr. Furey's expert report, nor his rebuttal expert report, written after he knew about Mr. Dight's manner of constructing his depreciation curves. While the Panel did not strike this portion of Mr. Furey's testimony, it does not accord great weight to that brief colloquy for those reasons.[25]

The only way that the Panel can assess the application of the depreciation curves to replacement cost new is for an expert to produce a timely expert report; then permit the adversary's expert to rebut that report; then ensure that expert depositions are taken; and finally, listen to experts testify and be cross-examined at the hearing. None of those accuracy-ensuring procedures occurred here on the replacement cost method.

---

HPE cannot do so after the hearing has ended, when all opportunity for a rebuttal expert, testimony and cross-examination has long passed.

[25] Federal Rule of Civil Procedure 26 (which, per the parties' Stipulation governs the procedural rules to apply in this case), is the applicable Rule upon which to base the Panel's decisions about the process required in giving weight to an expert's testimony. That Rule requires a timely submitted expert report, setting out all opinions of the expert, and explaining the methodology and analysis that support these opinions. An opposing expert is then given the opportunity to critique the analytical approach and assumptions used by that expert in a rebuttal report. Depositions of both sides' experts should follow allowing for the effective cross-examination of each. This approach gives the Panel the best chance for deciding which expert's opinions are the most well-grounded in appropriate methodology.

HPE counsel also urges that Mr. Dight's analysis should be impeached by a single line in the 612-page *MTS Fundamentals* which was never analyzed or applied to the Dight depreciation curve by an HPE expert report. The one line pressed by HPE says: "When appraising assets in groups, the MTS appraiser develops a ratio, or factor based on the age of the equipment, which when used as a multiplier applied to replacement cost results in a value reflecting all forms of depreciation." (TX 702 at p. 195). The weight to be accorded to this criticism of Mr. Dight is not great, because it was not even mentioned, much less relied upon, by the HPE expert in his rebuttal report. Moreover, the same page cited by HPE to support this assertion acknowledges that this is not the only appropriate approach to use in developing depreciation curves. Specifically, a footnote on the bottom of that same page explains that, while the chapter at issue "uses the term replacement cost," there may be occasions when using "historical acquisition costs is more appropriate or preferable." (TX 702 at p. 195 n.1). The choice of which option to use is precisely why an expert report and analysis would have been important, if HPE wished to press this criticism of Mr. Dight's depreciation curve method.

HPE's criticism of Mr. Dight's fair value data inputs lacks weight as well, for a significant reason:  In the October 2016 White Paper, HPE represented to DXC that it would conduct a *case-by-case analysis of assets under leases less than two years old*. Because 75% of leases were under two years old, this was an important promise: it meant that asset valuation data would be gathered by HPE during the many months prior to the closing of the Transaction, when HPE, as lessor, had access to all of the pertinent asset information.

But HPE never conducted a single analysis of a single leased asset of the 75% of leases that were less than two years old. Hrg. Tr. at 1339:2-6 (Fowlis). HPE, as lessor, had full advantage of all the asset value data on the leased assets when it stated its intention to do so in

the October 2016 White Paper. And yet, HPE never gathered that data nor did that case-by-case analysis that it said would be done. (TX 79 at 6). It rings hollow to criticize Mr. Dight's effort to discern market-based data in these circumstances.

The Panel finds the market-based approach to ascertain the "fair value" used by DXC's expert is the correct valuation approach under GAAP for this kind of equipment, and that it is preferable over the reproduction cost approach, for this kind of equipment. When the issue arose during summation, and counsel was asked why HPE never submitted an expert report using the application of the depreciation curve to the replacement cost if it now wanted to apply it in this case, counsel replied: "The issue [Dight's depreciation curve method] is brought into perspective by the rebuttal report submitted by Mr. Dight." Hrg. Tr. at 4795-13-4796:8 (HPE Closing Statement). For multiple reasons, this excuse for HPE's failure to submit an expert report on this theory in advance of the hearing is faulty: First, even if Mr. Dight had first described his method for deriving a depreciation curve in his rebuttal report, that report was submitted well before the hearing, in plenty of time for HPE to seek leave for its expert to respond, and that never occurred. Second, as a matter of fact, this issue was *not* first raised in Mr. Dight's rebuttal. The manner in which Mr. Dight applied his depreciation curves using an input based on replacement cost to the original equipment costs was set forth clearly in his very first expert report, submitted long before the hearing. *See* Dight Rep. (TX 1191 ¶101) ("To be clear, my methodology applies a depreciation curve based on used prices as percentages of Replacement Cost New to OEC."). HPE's rebuttal expert's report did not criticize that portion of Mr. Dight's methodology, nor did he do so in his deposition. The inescapable conclusion is that HPE chose not to ask any of its experts to submit an expert report applying Mr. Dight's depreciation curve to his Replacement Cost New. Rather HPE chose to rely solely upon Mr. Furey's reproduction cost methodology.

Any opportunity to offer new expert analysis has long passed. It would have been due, at the latest, in a rebuttal expert report submitted timely in advance of the hearing. There was none.

Thus, there were no expert reports timely submitted by HPE in advance of the hearing that either applied or explained whether the depreciation curves should have been applied to Replacement Cost New to calculate fair value. The Panel finds that an expert report with this analysis was not proffered by HPE in this case. The Panel makes its findings and conclusions based upon the expert reports that were timely submitted in advance of the hearing by experts whose depositions were taken upon the reports, and who testified about the opinions in their expert reports at the hearing.

The Panel concludes that Mr. Dight's approach to and valuation of fair value is supported by the accounting and valuation guidance as the favored methodology. His assessment of fair value is well supported by the market data he obtained. Thus, the Panel rules that DXC has met its burden of proof with respect to all inputs for the 90% Test for lease classification and will apply DXC's fair value figures, and discount rates, as calculated by Mr. Bialecki, to the 90% Test in calculating the award in this matter.[26] This conclusion is subject only to the Panel's

---

[26] In its closing arguments, HPE also argued that DXC must adopt HPE's original classification of the leases unless there was an "error" pursuant to ASC 840-10-25-27 (TX 1255 at 33), ASC 840-10-35-5 (TX 1255 at 50-51), ASC 840-10-35-4 (TX 1255 at 50), and ASC 250-10-20 (TX 1655 at 2). HPE Closing Slides 2-4. This argument requires expert analysis of these ASC provisions, and they have not been analyzed in any expert report submitted in this case. When HPE tried to elicit testimony to support this theory from its expert, Mr. Ellis, there was an objection made by DXC that this theory had never been stated in any of Mr. Ellis' 4 expert reports. When asked by the Panel Chair whether ASC 840-10-25-27 is analyzed in any of his expert reports, he answered: "I don't believe it is." Hrg. Tr. at 3873:22-3874:11 (Ellis). Thereupon, the few questions and slides that had already been asked on this ASC section were stricken. Mr. Ellis also testified that the classification should be changed "if that classification was determined in error." Hrg. Tr. at 3869:22-3870:12 (Ellis).

Nonetheless counsel argued in summation that the Panel should apply this ASC provision. It is a

determination as to whether Mr. Bialecki's calculation applies as of the Distribution Date or the Reduction Period date.

### C.   *Measurement Period: Distribution Date vs. Reduction Period*

The parties dispute the proper measurement period for the indemnification amount set out by the SDA. DXC contends that the agreement requires the Long Term Capitalized Lease Obligations to be measured as of the Distribution Date (March 31, 2017), while HPE argues that the proper measurement is as of the end of the Reduction Period (September 30, 2017).

Several provisions of the SDA are relevant to the question of the proper measurement period. SDA (TX 1661) Schedule 7.1(a) ¶4, as amended, provides:

> For a period ending six (6) months after the Distribution Date (the "Reduction Period"), Houston and Everett shall use commercially reasonable efforts to

---

separate section of the Accounting Standards Codification, that requires the rigor of an expert report; the opportunity for the opposing party to submit a rebuttal expert report; and expert depositions of the theory as applied to this case. None of that occurred, because HPE did not seek an opinion on this section from Mr. Ellis in his Assignment, and he did not analyze it in his expert reports. This is a highly technical set of accounting rules that requires expert reports and deposition – not introduction at the last minute at the hearing.

After having been stricken for these reasons, HPE's argument regarding this same theory – repackaged as though it were a point of "law" in the opening slides of its summation – is unavailing. It is not a provision of law. It is a specific provision of the ASC (ASC 840-10-25-27) as to which HPE was required to present an expert report and supporting analysis, if it sought to present it. That was not done by HPE's expert as to that ASC provision.

Moreover, this theory would have potentially been applicable only if the Panel were to find no GAAP error in the accounting classification of the leases. That is not the case here, where the Panel finds multiple errors of GAAP in the classifications done by HPE. Mr. Ellis confirmed that mistakes in the application of GAAP would include mistakes in the application of ASC 840, and would include using fair values that are too high or discount rates that are unreasonable. Hrg. Tr. 4369:11-4371:15 (Ellis). Therefore, for two separate and independent reasons, the Panel rejects the argument that ASC 840-10-25-27 (TX 1255 at 33), ASC 840-10-35-5 (TX 1255 at 50-51), ASC 840-10-35-4 (TX 1255 at 50) control the lease conversions at issue here. ASC 250-10-20 (TX 1655 at 2), is the more applicable section, because it would apply where GAAP error has been found with HPE's lease conversion methods, inputs, and resulting classifications.

reduce the aggregate amount among all Everett Group members of Long Term Capitalized Lease Obligations in excess of $250,000,000. It is further agreed that, notwithstanding Sections 2.3(a)(iv) and 2.3(b)(iii) and anything else to the contrary in this Agreement, any such amounts in Long Term Capitalized Lease Obligations that exceed $250,000,000 in the aggregate shall be considered Excluded Liabilities only after the expiration of the Reduction Period (and, for the avoidance of doubt, prior to the expiration of the Reduction Period shall be considered Everett Liabilities).

SDA (TX 1661. Ex. 1-A). Section 2.3(a)(iv), as amended,[27] provides the following definition of

"Everett Liabilities":

> (iv) the Liabilities arising out of or resulting from (A) the Total Everett Debt, (B) the Inherited Debt, (C) all Liabilities specified in subclauses (ii), (iii), (v) or (vi) of this Section 2.3(a) that are (I) capitalized lease obligations that expire on or before March 31, 2019 ("Short Term Capitalized Lease Obligations"), and (II) capitalized lease obligations that expire after March 31, 2019 ("Long Term Capitalized Lease Obligations") in an amount up to $250,000,000 in the aggregate among all Everett Group members as of the Distribution Date and (D) the Specified Everett Liabilities set forth in Schedule 2.3(a)(iv).

SDA (TX 183 at 3). Section 2.3(b)(iii), as amended, provides the following definition for

"Excluded Liabilities":

> (iii) Liabilities, if any, arising out of or resulting from any amounts that would constitute indebtedness or capitalized lease obligations of any member of the Everett Group under U.S. generally accepted accounting principles other than: (A) the Total Everett Debt; (B) the Inherited Debt; (C) all Short Term Capitalized Lease Obligations; (D) Long Term Capitalized Lease Obligations in an amount up to $250,000,000 in the aggregate among all Everett Group members as of the Distribution Date; and (E) for the avoidance of doubt, the Specified Everett Liabilities.

SDA (TX 183 at 3).

The measurement period provisions of the SDA have a plain and ordinary meaning that sets out the intent of the parties. As such, extrinsic evidence is not required to understand these

---

[27] This amendment effectively changed the treatment of HPE's Capitalized Lease Obligations that were "Short Term," which had not been a provision in the original SDA. It applied the $250 million cap only to Long Term capital leases, defined as those expiring after March 31, 2019. Short Term capital leases were therefore entirely excluded from the indemnity provision.

69

Sections of the SDA. The plain meaning of these provisions, when considered together, requires that the classification of leases as Long Term Capitalized Lease Obligations be performed on the Distribution Date; and thereafter, the amount owed on those leases (that were classified as Long Term Capitalized Lease Obligations as of the Distribution Date) be measured at the end of the Reduction Period. Between the Distribution Date and the end of the Reduction Period, the amount owed will decrease due to "natural burn down" of the leases due to lease termination and lease payments being made. This reading is consistent with the fact that all three of the relevant SDA provisions set out above were amended together in the First Amendment to the Separation and Distribution Agreement. (TX 1661, Ex. 1-A). Thus, all of these sections must be reconcilable when read together.

Section 2.3(b)(iii) provides that "Excluded Liabilities" – those that will be indemnified – include "Long Term Capitalized Lease Obligations" in excess of "$250,000,000 in the aggregate among all Everett Group members as of the Distribution Date." (TX 183 at 3). Similarly, Section 2.3(a)(iv) sets out "Everett Liabilities" to include "capitalized lease obligations that expire after March 31, 2019 ("Long Term Capitalized Lease Obligations") in an amount up to $250,000,000 in the aggregate among all Everett Group members as of the Distribution Date." (TX 183 at 3). And Schedule 7.1(a) provides that "notwithstanding Sections 2.3(a)(iv) and 2.3(b)(iii) and anything else to the contrary in this Agreement, any such amounts in Long Term Capitalized Lease Obligations that exceed $250,000,000 in the aggregate shall be considered Excluded Liabilities only after the expiration of the Reduction Period."

Schedule 7.1(a) references Sections 2.3(a)(iv) and 2.3(b)(iii), were amended at the same time, and should be read together to discern their meaning, which is that the classification of what will be categorized as an "Excluded Liability" happens on the Distribution Date, and the

amount to be indemnified on those "Excluded Liabilities" will be calculated after a 6 month "Reduction Period," negotiated by HPE to allow some of the capital leases to "naturally burn down."

A reasonable person in the position of the parties would have believed the SDA to have this meaning. This reading of the SDA gives meaning and effect to each word of the contract and is corroborated by the extrinsic evidence in the case. For example, on May 23, 2016 (the day before the SDA was executed), HPE sent DXC an email stating "Attached please find our proposed revisions to section 2.3 of the SDA with respect to capitalized lease obligations. We have also provided for an extension period in Schedule 7.1(a) that reflects a discussion earlier between Chris and Paul." (TX 207 at 1). This email attached the following proposed wording for what ultimately became Schedule 7.1(a)(4) (TX 1661, Ex. 1-A):

> For a period ending six (6) months after the Distribution Date (the "Reduction Period"), Houston and Everett shall use commercially reasonable efforts to reduce the aggregate amount among all Everett Group members of capitalized lease obligations, referred to in sections 2.3 (a)(iv) and 2 3(b)(iii) of this Agreement. It is further agreed that any excess to the amounts specified in sections 2.3(a)(iv) and 2.3(b)(iii) of this Agreement shall be considered an Excluded Liability only after the expiration of the Reduction Period.

(TX 207 at 2). This draft language, proposed by HPE's counsel, indicates that "capitalized lease obligations" are those "referred to" and "specified in" Section 2.3(a)(iv) and 2.3 (b)(iii), and that "any excess" of what is classified as an "Excluded Liability" shall be considered an "Excluded Liability" only after the Reduction Period. This language was included in the original SDA signed the next day.

The concept of "natural burn down" as the means to reduce the capital leases during the "Reduction Period" is also corroborated by other extrinsic evidence. HPE's Hsu testified that this concept that he had "suggested to Paul," as stated in the email quoted above, was the reason

for the suggested language in the amendment, which was then signed by both parties. Hrg. Tr. at 3281:24-3285:2 (Hsu). The concept, as described by Hsu, was that the amount of the capital leases that still existed on the Distribution Date, could be reduced by the natural lease termination process, if he had another 6 months for that "natural burn down" to occur. Mr. Diggins, an HPE employee who then transitioned to DXC after the spin/merge, regularly circulated "burn down" charts "tracking how the existing lease balances would be reduced by September 30, 2017," and on September 2, 2016 Diggins wrote "everything looks good to 31st March, as long as we hit the $350 and will be guaranteed to hit the $250 with 6 months." (TX 1143).

Significantly, the October 2016 White Paper specifically states that the leases should be reclassified as operating leases "except for the leases noted above that will continue to be capital leases and is estimated to be within the $250 million contractual limit at a date six months after closing of the transaction, currently projected to be September 30, 2017." (TX 79 at 6). While DXC raised questions about various aspects of the White Paper, it did not raise a question or disagree with this statement as to the final measurement date.

HPE argues in support of the concept of "natural burn down" in its briefing. HPE writes that "[a]s lease payments are made each month, the amount of any capital lease obligations *naturally 'burns down'* so the outstanding obligations are less on September 30 than on March 31." HPE Post-Hrg. Br. at 45.

For the above reasons, the Panel's reading of these contract provisions is that leases are classified as capital or operating leases as of March 31, 2017, and that the remaining capital leases would be tracked for the 6 months of the "Reduction Period." During that Reduction Period, the amount of indemnification obligation would be reduced by the amount of the lease

obligations that had, by a natural process of termination and lease payments, diminished to a lesser dollar amount.

This process of "natural burn down" of the amount of capital leases caused by their maturation and termination during the 6 months of the Reduction Period does not, however, extend to the IBM or Perspecta transactions discussed below. Those amounts shall not be deducted from the indemnification obligation of HPE.

In the IBM transaction, HPE argues that IBM Credit LLC purchased over $100 million of assets covered by the leases at issue, and that those leases were therefore terminated on September 30, 2017, the last day of the Reduction Period. HPE also contends that in the Perspecta transaction on May 31, 2018, DXC sold its public sector business to Perspecta and transferred the lease payment obligations on the transferred leases to Perspecta.

DXC responds that the IBM Leases were refinanced through IBM Credit, which involved a series of transactions to accomplish the refinancing by discharging the liabilities that DXC owed to HPE-FS and transferring DXC's lease payment Liabilities as a DXC Liability owed to IBM Credit. IBM Credit paid HPE-FS approximately $114 million in the transfer of those leases to IBM Credit, as IBM Credit became the new lessor of the assets to DXC.

These leases did not terminate. To the contrary, DXC continues to owe the lease "Liability" to IBM Credit, the new lessor, on the same assets that were covered by the leases between DXC and HPE. The Liability continues to exist; the obligee is now IBM credit.

The Panel's Information Request at the end of the evidentiary hearing sought additional information about the IBM and Perspecta leases, including dates, amounts, and information germane to the nature of these transactions. This additional information was sought to aggregate evidence that was already in the thousands of exhibits in the case, but not presented at the

hearing with slides or other documents that compiled all of the evidence in an organized way. The economic reality of the transactions, as well as the dates of the various events that occurred, have been considered by the Panel as to both transactions.

The Panel finds that the IBM transaction was a lease refinancing transaction, in which the Liability was still retained by DXC, but the lessor became IBM Credit rather than HPE-FS. HPE was fully paid for its transfer of those leases to IBM Credit, including an added increment for the transfer before the lease terms had expired. The same assets that had been leased by DXC from HPE became a lease obligation from DXC to IBM Credit. Regardless of the names of the various documents executed to effect this transfer, the economic reality is unequivocally a lease refinancing arrangement; DXC still owes the Liability, as defined in the SDA; the lease payment obligations continue to be a DXC Liability past the Reduction Period date; and those leases that meet the criteria of Long Term Capital Lease Obligations are subject to the Indemnification obligation of HPE.

The Tribunal's conclusion that the reduction in the amount owed the capital leases is limited to "burn down" is supported by the language of the SDA itself. Section 4 of Schedule 7.1 (a) to the SDA expressly references that during the Reduction Period, "Houston and Everett shall use commercially reasonable efforts to reduce the aggregate amount" of capitalized lease obligations. It is that reduction to which HPE is entitled and not the IBM refinancing transaction.

Moreover, the IBM transaction, while it closed on September 30, 2017, was not recorded on DXC's books until October, in accordance with DXC's standard financial recording practices. This case is about accounting and what is critical to the determinations in this case is what was on DXC's books as of September 30, 2017. The leases that were sold to IBM were still on DXC's books as of September 30, 2017, the critical date, and accordingly indemnification is

owed on those leases.

The Perspecta leases were Liabilities transferred by HPE to DXC on the Distribution Date and were still DXC Liabilities through the end of the Reduction Period. Thus, any of these leases that are classified as Long Term Capitalized Lease Obligations are subject to HPE's indemnity obligations. This transaction occurred many months after the end of the Reduction Period, and by the express terms of the SDA, the sale of these leases in the Perspecta transaction did not extinguish HPE's Indemnification obligation under the SDA. Section 6.9 of the SDA, titled "Survival of Indemnities," explicitly governs such sale of a business segment:  the "rights and obligations of each of [HPE] and [DXC] and their respective Indemnified Parties under this Article VI shall survive the sale or other transfer by any Party of any Asset or business or the assignment by it of any Liabilities."  (TX 1054 at 56).

Under the provisions of the SDA, the leases in the Perspecta transaction that qualified as Long Term Capitalized Lease Obligations as of the Distribution Date and the amounts due on any such Long Term Capitalized Lease Obligations were set as of the end of the Reduction Period and shall be indemnified.

The Panel rules that the classification of the Disputed Leases as "Long Term Capitalized Lease Obligations" is to be done as of the Distribution Date, and that the amount owed on the Disputed Leases so classified shall be calculated as of the end of the Reduction Period, and that neither the IBM nor Perspecta transaction amounts shall further decrease the indemnification obligation as of the end of the Reduction Period.

### D. Amount Subject to Immediate Indemnity Payment

HPE argues that DXC is entitled to indemnification only for lease payments that have already been made and those due in the future as they become due and payable.  DXC contends

that HPE is contractually obligated to provide dollar-for-dollar indemnification to DXC for any amount of Long Term Capitalized Lease Obligations that exceed $250 million.

In its Ruling on partial Summary Judgment, the Panel told the parties that it would hear evidence and argument at the hearing about whether an objective person in the position of the parties would construe the contract to mean dollar for dollar Indemnification, as well as the timing of the indemnification payments.

Section 6.2 of the SDA (TX 1054 at 52-53) sets out HPE's indemnity obligation:

> [HPE] shall indemnify, defend and hold harmless [Everett] . . . from and against any and all Liabilities of Everett Indemnified Parties relating to, arising out of or resulting from any of the following items . . . (a) any Excluded Liability; (b) the failure of [HPE] to pay, perform or otherwise promptly discharge any Excluded Liabilities, whether prior to, at or after the Distribution Time . . .

"Liabilities" are defined by the SDA as:

> any and all debts, guarantees, liabilities, costs, expenses, interests and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured, reserved or unreserved, or determined or determinable, and whether or not recorded or reflected or required to be recorded or reflected on the books and records or financial statements of the applicable Person, including those arising under any Law, claim, demand, Action, whether asserted or unasserted, or order, writ, judgment, injunction, decree, stipulation, determination or award entered by any Government Authority and those arising under any Contract, release or warranty, or any fine, damages or equitable relief which may be imposed, in each case, including all costs and expenses related thereto.

SDA Section 1.1(44) (TX 1054 at 13).

"Excluded Liabilities" are defined by the SDA as:

> Liabilities, if any, arising out of or resulting from any amounts that would constitute indebtedness or capitalized lease obligations of [Everett] under U.S. generally accepted accounting principles other than: . . . (D) Long Term Capitalized Lease Obligations in an amount up to $250,000,000 in the aggregate . . . ."

Section 2.3(b)(iii), as amended (TX 183 at 3).

The relevant provisions of the SDA, supported by the entirety of the factual evidence adduced at the hearing relevant to this topic, lead to the conclusion that the quantification of indemnity is the dollar-for-dollar amount of Excluded Liabilities exceeding $250 million. The SDA explicitly provides that all Long Term Capitalized Lease Obligations above $250 million are "Excluded Liabilities" retained by HPE. SDA § 2.3(b)(iii), as amended (TX 1661, Ex. 1-A). Section 6.2 further requires HPE to indemnify DXC from and against all liabilities associated with the "Excluded Liabilities." SDA § 6.2(a) (TX 1661).

DXC proffered ample evidence demonstrating that the parties' understanding of the relevant SDA provisions comports with this meaning of that agreement:

- DXC's Vice President of Finance, Colleen Davis, who was both an HPE and a DXC employee implementing the SDA, understood what the provision meant. She testified: "So through a course of discussions and meetings, I understood that HPE agreed to cap the amount of capital leases and the lease liability that would spin. And so to do that there would be a process to convert leases to operating lease, and then create a cap. And then HPE would indemnify dollar for dollar above that cap." Hrg. Tr. at 1630:12-20 (Davis).

- In an internal January 25, 2017 email (TX 261), Ian Fowlis, HPE's CFO wrote: "Not converting the German leases is not an option as HPE would have to pay CSC dollar for dollar for amounts over $250M and I am not prepared to go back to Tim Stonesifer and tell him we need to write a check for $80M." Clearly, he understood the meaning of the SDA, which was the contract that he was working to implement by converting capital leases. As Delaware law states, "[t]he true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del.

77

2006).  While HPE attempts to minimize Mr. Fowlis' understanding of the contract by arguing that he did not negotiate it, that is not the test under Delaware law.  Fowlis and Davis are clear examples of a person "in a position of the parties" who "would have thought [what] it meant."  To argue that Mr. Fowlis, the central figure in the lease conversion effort, did not know the indemnification consequences of failing to properly convert those $1.3 billion of capital leases strains credulity.

- Fowlis also testified as follows:

Q. Sir, you understood that whatever leases put you over the $250 million cap, whichever leases were capital that got transferred as capital leases to DXC, that HPE would have to pay CSC dollar for dollar for amounts over $250 million. Correct?

A. I'd say not -- I was not 100 percent certain

Q. Did you not use those words?

A. I did use those words.
Hrg. Tr. at 1402:16-1403:2 (Fowlis).

- In an August 1, 2017 internal message chain between HPE's Joe Dierdorf and HPE's Ian Fowlis (TX 24) discussing re-doing lease conversions, Fowlis instructed: "It should only be a last resort to prevent a big payout."

- Jaclyn Cannici, of Duff & Phelps, testified that Ian Fowlis told her that the repercussions of failing the capital lease test would be a dollar-for-dollar big payment. Cannici was shown email correspondence between herself and others at Duff which stated in pertinent part: ". . . HP would like to confirm the fair value of the assets within the leases . . . ; if FV is less than NBV, that will trigger payment due to DXC *in the amount of the difference.*" (TX 805).

- When asked about another email (TX 806), as it related to TX 805, Cannici testified:

Q. And then you write, "There are real dollar implications to our work for HP. I can explain

over the phone if you'd like to call me." Did I read that correctly?

A. Yes.

Q. And your assertion that "There are real dollar implications to our work for HP," that was a reference to the payment obligation to DXC that we saw in a prior document just now. Is that correct?

23 A. Yes."

Hrg. Tr. at 3158:6-3160:23 (Cannici).

The evidence set forth on the issue demonstrates that the parties understood the

indemnification amount under the SDA to be the dollar-for-dollar value of the "Excluded

Liabilities." The Panel therefore rules that dollar-for-dollar is the appropriate measure of the

amount for which DXC shall be indemnified.

### E.     *Timing of Indemnification Payment for Excluded Liabilities*

HPE argues that DXC cannot recover indemnification for Liabilities that have not been

"incurred," citing Section 6.7 of the SDA. Thus, HPE argues that it should only be obligated to

make payments on amounts actually paid and those due in the future as they become due and

payable. Section 6.7(a) provides that "Indemnification or contribution payments in respect of

any Liabilities for which an Indemnified Party is entitled to indemnification or contribution

under this Article VI shall be paid by the Indemnifying Party to the Indemnified Party as such

Liabilities are incurred upon demand by the Indemnified Party." (TX 1054 at 55).

As quoted above, Section 1.1(44) of the SDA (TX 1054 at 13) defines "Liabilities" as:

> any and all debts, guarantees, liabilities, costs, expenses, interests and obligations, **whether accrued or fixed, absolute or contingent, matured or unmatured, reserved or unreserved, or determined or determinable,** . . .

The SDA definition of Liabilities is extremely broad, explicitly covering Liabilities that

have not yet "matured" or been "determined" and even covering "contingent" Liabilities. This

language expressly applies to lease payments that are a contractual liability under a lease, but not yet a matured payable amount based on a monthly payment schedule. Nonetheless, the Panel's Summary Judgment ruling permitted the parties to introduce evidence, if any, to support their respective arguments about the timing of the indemnification payment.

HPE presented no evidence to support its position on SDA Section 6.2. There is no testimony nor exhibit that supports HPE's position, despite the thousands of documents produced in discovery and the hundreds of documents that have been put into evidence.

The Panel finds that the provisions of the SDA are clear as to the parties' intention about the timing of the indemnification payments for the capital lease Liabilities: and that the payment is due immediately upon the Distribution Date for capital lease obligations exceeding $250 million, unless reduced by the "natural burn down" of leases during the Reduction Period. The contractual liability to pay the lease, regardless of the payment schedule, is a "Liability" that has accrued when it became a DXC Liability as the contractual lessee on that lease. It is the lease contract that creates the "Liability" as that term is defined in the SDA; that "Liability" then matures as the monthly payments become due. This situation is expressly covered by the language of the SDA, which defines a "Liability" to include "unmatured" liabilities. Here, the "Liability" to make the lease payments was incurred as soon as DXC became the lessee under the contract.[28]

---

[28] The cases dealing with the construction of contracts as to when debts are "incurred" cited by HPE are inapposite. HPE urges that a liability is not "incurred" until there is a legal obligation to make payment. HPE Post- Hrg. Br. at 49-50. As discussed above, the Tribunal must give effect to each word in the SDA and construe the agreement as a whole to uphold the meaning of the parties. Unlike the contracts in the cases cited by HPE, the definition of Liabilities in the SDA conflicts with HPE's premise. It is the plain language used by the parties in their expansive definition of Liabilities that must control the construction of the indemnification obligation under this contract, the SDA.

Moreover, it would be commercially unreasonable to read the SDA to require DXC to request indemnification each month for years for thousands of lease payments made, especially in light of the provision that permits assignment of the leases to another entity that would have to track each monthly lease payment and report it. *See* SDA § 6.9. Nor would such a construction be consistent with the reason for the requirement of payment for "Liabilities" based on a failure to adequately convert capital leases to operating leases. DXC required this term because of its belief as to the impact of the capital leases on the valuation of the deal. That impact had to be ameliorated pursuant to the SDA within 6 months of the closing, to enable DXC to report it concurrently in its financials. Partial payments and payments over time in the future would not serve to accomplish the parties' objective in structuring the transaction as it related to the capital leases. Moreover, such an unruly result would be absurd in the context of the sophisticated transaction contemplated by the SDA, and HPE has not produced any evidence suggesting that anyone at either HPE or CSC/DXC ever considered the SDA to require such an indemnification process.

### F.   *HPE's Affirmative Defenses*

HPE contends that DXC's claims in this action are barred by equitable estoppel and by DXC's breach of the "mutual cooperation" provisions of the SDA. Specifically, HPE argues that DXC is estopped from challenging the assumptions used by HPE for its lease conversions because, HPE contends, CSC did not object to those approaches until well after the conversions were completed and did not cooperate in the conversion.

In its prehearing brief, HPE contended that "in the fall of 2016, it told DXC how it intended to modify the leases" in its October 2016 White Paper, and that CSC/DXC "agreed to the proposed methodology" set forth in the White Paper "prior to DXC filing its S-4 statement

81

with the SEC." HPE Pre-Hrg. Br. at 6. The evidence adduced at the hearing was clear that: HPE did not use the methodology that it represented to CSC that it would use, rendering key representations of the October 2016 White Paper misrepresentations, by the omission to state that the lease conversion process being undertaken by Fowlis' team was not what had been represented in the White Paper. And the evidence adduced at the hearing was equally clear that CSC executives repeatedly questioned the HPE representations about methodology, and kept asking for more information to support the lease conversions that HPE had done. In responding to the CSC/DXC data requests, HPE gave information sparingly, at best, about the conversion process, and finally just outright refused to provide more data to support the HPE methodology.

The Panel concludes that the weight of the evidence, including ample evidence beyond that described in the above paragraph, does not support the Affirmative Defense of estoppel, nor the affirmative defense that DXC did not comply with its contractual duty under SDA Section 7.1(a) to cooperate with HPE. (TX 1054 at 59-60).

HPE bears the burden of proof by a preponderance of the evidence to show that DXC did not cooperate with HPE. There was a genuine paucity of such evidence, and HPE did not meet its burden of proof on these affirmative defenses. Nor does the evidence support HPE's equitable affirmative defenses. Under Delaware law, a party asserting the defense of equitable estoppel "bears the burden of demonstrating by clear and convincing evidence that: (1) [it] lacked knowledge or the means of obtaining knowledge of the truth of the facts in questions; (2) [it] reasonably relied upon the conduct of the party against whom the estoppel is claimed . . .; and (3) [it] suffered a prejudicial change of position as a result of [its] reliance upon that conduct." *Pilot Point Owners Ass'n v. Bonk*, 2008 WL 401127, at *2 (Del. Ch. Feb. 13, 2008). The standard for establishing these elements "are stringent: the doctrine is applied cautiously and

82

only to prevent manifest injustice." *Id.*

Here, HPE has failed to demonstrate the elements of equitable estoppel. For example, HPE cannot show that it "lacked knowledge" that DXC could, or did in fact, question the appropriateness of the lease conversions performed by HPE. HPE asserts that DXC should have told it while there was still time to perform further conversions that DXC might not accept the conversions. HPE points to certain emails in which DXC executives stated in August 29, 2017 that they believed the converted leases would fail, (TX 1135), and on September 26, 2017 that they did not want to "show their hand" or "tip their hand" that DXC might take the view that the conversion was not successful and that the leases were still capital leases. (TX 1138). But HPE well knew that DXC was concerned about, and requesting clarifying information about, the HPE lease conversion method. And HPE was unquestionably aware of DXC's concerns during all relevant time periods.[29]

Other evidence shows that HPE knew that DXC was seriously questioning HPE's conversion process. In August 2017, which falls between the closing date and the end of the Reduction Period, Ian Fowlis and Joe Dierdorf discussed "re-doing" the lease modifications to "prevent a big payout." (TX 24). These facts demonstrate that HPE cannot establish that it lacked the knowledge necessary to satisfy the elements of equitable estoppel. They also prove that HPE had not, in fact, "reasonably relied" on DXC's conduct in believing that HPE was

---

[29] HPE's arguments based on the Form S-4 filing provide little weight to the estoppel defense. HPE and DXC are both sophisticated corporate entities accustomed to regulatory filings and the requisite bases for such filings. HPE knew that Form S-4 pro forma financial statements are not audited; are filed several months before the Closing, when DXC has no information other than what HPE offers; and that DXC would need to file audited GAAP financial statements when it did the mandatory purchase price accounting after the closing, where DXC would undoubtedly examine the lease conversion process closely for compliance with GAAP.

"safe" from DXC's questioning of the conversions.  To the contrary, the evidence shows that HPE was still concerned that they might be subject to a big payout if such questioning by DXC arose.  HPE's Neil Manna explicitly told his fellow HPE executives, Chris Natali and Ian Fowlis that, despite the July 2017 White Paper, DXC was "struggling [to] maintain[] operating lease treatment." (TX 88).

Equitable estoppel that HPE seeks here is an equitable remedy.  Although it argues that it disclosed to DXC its methodology for lease conversions in the October 2016 White Paper, the evidence shows that HPE did not in fact implement the conversions in the manner represented in that White Paper, when compared to the action taken as shown in the Lease Conversion File. Having deviated materially from the representations made in the October 2016 White Paper about the actions that it would take to effectuate the lease conversions, HPE cannot now credibly seek equitable relief for DXC's reliance on those representations for purposes of the Form S-4 at the time that they were made.  Such a ruling would be contrary to justice.

The Panel notes that when a party seeks equity, it must do equity.  The facts set forth in the above opinion can reach only one conclusion: that the HPE team did not "do equity" in the manner in which it handled HPE's lease conversion obligation under the SDA.  Viewed through that lens, HPE has not acted in a way that entitles it to an equitable remedy.  HPE did not carry out the conversions as it said it would, and withheld information that it could have shared with DXC.  There can be no finding that DXC is estopped on such facts.

Based on the above, the Panel rules that HPE has failed to meet its burden of proof on its affirmative defenses.

## VI.    REMEDIES

The Panel, having found that DXC has met its burden of proof separately for each of the

75% Test and the 90% Test for lease classification, therefore awards DXC its indemnification

based on each of these bases, independently.  Applying DXC's estimated economic lives to the

75% Test, and DXC's discount rates and fair values for the 90% Test, adds up to long term

capital leases with a value of $1,070,006,610 of as of the Distribution Date.[30] (*See* DXC Post-

Hrg. Br, Appendix B, Bialecki Scenario X). This number must be reduced by the "natural burn

down," as calculated by Mr. Bialecki, resulting in a total of $881,810,651 in long term capital

lease liabilities to be indemnified as of the Reduction Period end date. [31]   Subtracting the $250

million cap results in an award of $631,810,651.[32]  That amount was due immediately as of the

---

[30] HPE argues that lease payments for all U.S. leases must be adjusted by 4% to account for property taxes.  The Panel finds that this adjustment is unsupported by sufficient data and analysis to warrant application herein.  Accordingly, the Panel does credit DXC's very minor corrections to HPE's calculations.

[31] The Panel notes that the calculation of the total amount of the indemnification owed by HPE would not vary significantly, even if the Panel had determined certain of the inputs differently. For example, applying either DXC's Discount Rate and HPE's Economic Life or applying DXC's Economic Life and HPE's Discount Rate while using DXC's Fair Values results in almost exactly the same value for the capital leases liabilities with each resulting in over $881 million after the burn down. Even applying HPE's economic life and HPE's fair values while using only DXC's discount rate results in only the slightly lower value for capital lease liabilities of over $807 million before the burn down.

[32] While HPE disagreed with some of Mr. Bialecki's assumptions in correcting Mr. Ellis' analysis under the various "scenarios" he prepared, there is no dispute as to the calculations of the amounts owing based on the DXC assumptions as found by the Panel. Hrg. Tr. 4682:4-4684:4.  The Panel finds that Mr. Bialecki's calculations as set forth in his scenarios, Appendix B to the DXC Post-Hrg. Br., are correct as based on those assumptions.

date of the indemnification demand, dollar for dollar.[33]

Pursuant to Section 7.6 the SDA, "any amount not paid when due pursuant to this Agreement shall accrue interest at 3% per annum, or, if less, the maximum interest rate allowable under applicable Law in the applicable jurisdiction, compounded quarterly." (TX 1054 at 64). Accordingly, DXC shall receive pre-award interest from HPE at a rate of 3% per annum, compounded quarterly, calculated from November 8, 2017 (date of indemnification demand) until the date of this award. DXC shall also receive post-award interest, as agreed by the parties in the SDA, on the Award amount, plus pre-award interest, at a rate of 3% per annum, compounded quarterly, calculated from the date of the Award until such time that the Award and pre-award interest is paid in full.

Pursuant to section 8.4 (iv) of the SDA all costs of the arbitration, including the arbitrators' fees, are to be born equally by the parties, and each party is responsible for its own attorneys' fees and other costs and expenses.

It is hereby **ORDERED**:

(1)     That Respondent Hewlett Packard Enterprise Company (HPE) has breached the Separation and Distribution Agreement (SDA) between HPE and Claimant DXC Technology Company (DXC) and thus shall indemnify DXC thereunder.

---

[33] The Tribunal notes that Mr. Ellis, HPE's expert, found that 929 leases failed the accounting tests and remained capital leases with a value of over $149 million as of September 30, 2017 after deduction of the $250 million cap.

(2)     That Claimant DXC is awarded $631,810,651, plus interest, as recovery on all of

its claims as stated against HPE in the above-referenced matter, and that HPE shall pay

this amount to DXC within 30 days of the date of this award.

(3)     That DXC shall receive pre-award interest from HPE at a rate of 3% per annum,

compounded quarterly, calculated from November 8, 2017 until the date of this award,

which amount is $34,266,584.

(4)     That DXC shall receive post-award interest on this award from HPE, also at a rate

of 3% per annum, compounded quarterly, calculated from the date of this award until

such time as the recovery and pre-award interest is paid in full.

(5)     This FINAL AWARD is in full settlement of all claims submitted to this

arbitration.  All claims not expressly granted herein are hereby denied.

(6)     This FINAL AWARD may be executed in any number of counterparts, each of

which shall be deemed an original and all of which shall constitute together one and the

same instrument.


Dated: August 15, 2019                    By the Panel:
New York, New York


_____
Hon. Barbara Jones, Arbitrator


_____
Edna Sussman, Arbitrator


_____
Hon. Faith S. Hochberg, Arbitrator and Panel Chair


87

compounded quarterly, calculated from November 8, 2017 until the date of this award, which amount is $34,266,584.

(4)     That DXC shall receive post-award interest on this award from HPE, also at a rate of 3% per annum, compounded quarterly, calculated from the date of this award until such time as the recovery and pre-award interest is paid in full.

(5)     This FINAL AWARD is in full settlement of all claims submitted to this arbitration. All claims not expressly granted herein are hereby denied.

(6)     This FINAL AWARD may be executed in any number of counterparts, each of which shall be deemed an original and all of which shall constitute together one and the same instrument.

Dated: August 15, 2019                      By the Panel:
New York, New York

Hon. Barbara Jones, Arbitrator

Edna Sussman, Esq., Arbitrator

Hon. Faith S. Hochberg, Arbitrator and Panel Chair

I, Hon. Barbara Jones, do hereby affirm upon my oath as an Arbitrator, that I am the individual described in and who executed this instrument, which is the FINAL AWARD.


_____                    _____
Date                                                                     Barbara Jones


I, Hon. Faith Hochberg, do hereby affirm upon my oath as an Arbitrator, that I am the individual described in and who executed this instrument, which is the FINAL AWARD.

_8|15|19_                                                    _____
Date                                                                     Faith Hochberg

I, Edna Sussman, Esq., do hereby affirm upon my oath as an Arbitrator, that I am the individual described in and who executed this instrument, which is the FINAL AWARD.

_8|15|19_                                                    _____
Date                                                                     Edna Sussman, Esq.


88

I, Hon. Barbara Jones, do hereby affirm upon my oath as an Arbitrator, that I am the individual described in and who executed this instrument, which is the FINAL AWARD.

8|15|19
Date

Barbara Jones

I, Hon. Faith Hochberg, do hereby affirm upon my oath as an Arbitrator, that I am the individual described in and who executed this instrument, which is the FINAL AWARD.

_____
Date

_____
Faith Hochberg

I, Edna Sussman, Esq., do hereby affirm upon my oath as an Arbitrator, that I am the individual described in and who executed this instrument, which is the FINAL AWARD.

_____
Date

_____
Edna Sussman, Esq.

88